UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

NEW YORK CITY TRANSIT AUTHORITY,

                Plaintiff,

         -against-

EXPRESS SCRIPTS, INC.,

              Defendant.

------------------------------------------------------------

**JURY TRIAL DEMANDED**

Case No. 1:19-cv-05196

## AMENDED COMPLAINT

Plaintiff the New York City Transit Authority ("NYCTA" or "Plaintiff"), by and through its undersigned counsel, for its Amended Complaint against Express Scripts, Inc. ("ESI" or "Defendant"), alleges as follows:

### PRELIMINARY STATEMENT

1.     New York City's massive and aged subway and bus system is facing substantial financial challenges. Yet defendant ESI, a contractor that the NYCTA hired to manage the prescription drug benefit plan for its subway operators, bus drivers, and other employees and retirees, failed in its role as pharmacy benefits manager ("PBM"), resulting in tens of millions of dollars of fraudulent, abusive, or excessive claims unnecessarily paid by the NYCTA. Through this action, the NYCTA seeks to enforce ESI's contractual obligation to prevent and repay these claims, as well as additional overpayments for prescription drugs that ESI approved but were not covered by the NYCTA's prescription drug benefit plan.

2.     As the intermediary between the NYCTA, the employer sponsor, and the pharmacies filling the prescriptions, ESI oversees and manages the administration of the NYCTA's prescription drug benefit plan, including selecting pharmacies, negotiating prices, and

processing the thousands of individual claims made by participating employees and retirees.

3.      Since the NYCTA retained ESI as its PBM in April 2016, the NYCTA has paid tens of millions of dollars in fraudulent, abusive, or excessive prescription drug claims that were managed, administered, and fulfilled by ESI.  To date, two NYCTA employees have been convicted of federal fraud and conspiracy charges in connection with these overpayments.  But the scope of this fraud, abuse, and excess extends well beyond these two convictions: it implicates dozens of individuals, physicians, and pharmacies across the country, and involves instances of unreasonably high prescription claims that ESI should have controlled and outright fraud that it should have identified and prevented.  All of it took place on ESI's watch and was preventable had ESI fulfilled its obligations under its contract with the NYCTA.  And under that contract, ESI is required to repay these overpayments to the NYCTA, as well as any other claims that exceed the terms of the benefit plan and the operative contract.

4.      The fraudulent, abusive, or excessive claims involve compound prescription drugs.  Compound prescriptions require pharmacies to combine, mix, or alter drug ingredients to create a medication that is tailored to the unique needs of a patient.  While compounds typically include component drugs that are approved or regulated by the U.S. Food and Drug Administration ("FDA"), the compounds themselves are not; and they often cost thousands—even tens of thousands—of dollars more than non-compound prescription drugs.  With these perverse incentives in place, fraudulent schemes have surfaced involving corrupt physicians authorizing illegitimate prescriptions for compound medications, complicit pharmacies filling them, and kick-backs paid to the patients requesting them.  Many of these schemes involve marketers who are paid commissions for referring prescriptions to pharmacies.  These drug frauds cost health care plan sponsors, like the NYCTA, huge amounts in false claims.  And as the

largest PBM in the country, ESI was well-aware of the growing problem of compound prescription fraud long before it became the NYCTA's PBM.

5.      Compound drug fraud, excess, and abuse is detectable and preventable using the data ESI collects, and the NYCTA pays ESI to do just that.  Yet shortly after the NYCTA and ESI entered into their contract, claims for compound medications by the NYCTA prescription benefits plans participants spiked dramatically, increasing from less than half a million dollars per month in 2015 to $8.8 million in March 2017.  The NYCTA in-house plan administration staff first noticed these spikes early and in real time, and brought them to the attention of ESI on multiple occasions.  At first, ESI dismissed the concerns, claiming that it did not see similar spikes across its client portfolio.  Despite the NYCTA's persistence, ESI failed to take adequate measures to monitor, identify, and stop activity that, on its face, bore the hallmarks of fraud, abuse, and excess.

6.      For example, in June 2016, only two months after the contract term began, the NYCTA asked ESI about a single individual's claim for an erectile dysfunction compound medication that totaled $405,326.43 over three months.  ESI assured the NYCTA that it would address its concerns over the extraordinary charges for compounds, and the $400,000 erectile dysfunction claim proved non-fraudulent.  Yet compound medication costs continued to rise for suspicious reasons that should have provoked an aggressive response from ESI—including a single Utah pharmacy that was responsible for over $20 million of the NYCTA's compound spending in the first year of ESI's contract term.  ESI offered only one solution—pre-approval of compound drug claims—that was not possible under the NYCTA's collective bargaining agreement, and failed to offer a broader, more specific, or attentive solution as required under

ESI's contractual duties.  Only after the NYCTA began manually reviewing individual claims and instructing ESI to block specific physicians and pharmacies did costs begin to decrease.

7.      But policing and preventing prescription fraud, abuse and excess was not the NYCTA's duty under the contract—it was ESI's.  Under the plain contract terms, ESI was obligated to process claims in a prudent and expert manner, investigate potential fraudulent, abusive, or excessive overpayments, maintain comprehensive audit programs, monitor the pharmacies in its network, repay overpayments, and generally meet a prudent PBM's standard of care and diligence.  Even a minimal application of these duties would have prevented the fraudulent, abusive, and excessive claims—which were not only obvious and recurring, but mirrored the sharp rise in compound claims experienced by another public sector ESI client that also proved to be fraudulent.  The NYCTA has suffered tens of millions of dollars in damages stemming directly from ESI's breach of these contractual obligations, as well as additional millions in reimbursed claims that were outside the scope of the prescription drug benefit plan ESI was tasked to administer—all of which the NYCTA seeks to recover through a judgment in this action.

## THE PARTIES

8.      Plaintiff the New York City Transit Authority is a New York public benefit corporation with a principal place of business located at 2 Broadway, New York, New York 10004.

9.      Defendant Express Scripts, Inc. is a Delaware corporation, with its principal place of business located at One Express Way, St. Louis, Missouri 63121.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

11.     This Court may exercise personal jurisdiction over Defendant pursuant to CPLR §
302(a)(1) and (2), because the acts subject to the Amended Complaint arise from Defendant's
transaction of business within New York State and/or agreement to supply services in New York
State and/or Defendant's commission of a tortious act within New York State.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial
part of the events or omissions giving rise to the claims alleged by Plaintiff occurred within the
City, State, and County of New York.

## STATEMENT OF FACTS

**BACKGROUND AND REQUEST FOR PROPOSAL**

13.     The NYCTA is the public authority operating the public subway and bus systems
in New York City.  As of the end of 2018, the NYCTA (including its subsidiary, the Manhattan
and Bronx Surface Transit Operating Authority) had 50,129 full and part-time employees.

14.     ESI is the largest PBM in the United States and the country's 25th largest
company overall.  Its annual revenues exceed $100 billion.

15.     PBMs are third-party administrators of prescription drug programs that are
primarily responsible for processing and paying prescription drug claims.  As part of their
general duties, PBMs maintain formularies, contract with pharmacies, negotiate discounts and
rebates with drug manufacturers, coordinate payment of claims, and monitor claims activity.

16.     As the intermediary between the sponsor and the pharmacies, PBMs are best-
positioned to monitor claims activity and determine whether there are any indications that the
claims are fraudulent, abusive, excessive, or otherwise illegitimate.

17.     According to its 2017 Annual Report, ESI "provides a full range of integrated
pharmacy benefit management services, including home delivery pharmacy care, specialty

pharmacy care and benefit management, benefit design consultation, drug utilization review, formulary management, and medical and drug data analysis, that guide patients and plans toward better health by prioritizing care and increasing savings."

18.     The NYCTA provides its employees and retirees with health care and prescription drug benefits through its contract with Aetna, Inc.  The benefits package consists of two plans: the Commercial Plan, which serves its active workforce, and the Employer Group Waiver Plan ("EGWP"), which serves retirees eligible for Medicare.  The pharmacy benefit plan covered represented employees of the NYCTA and certain non-represented operating employees of the NYCTA, along with represented employees of the MTA Bus Company and Staten Island Railway (both MTA subsidiaries).  Altogether, in 2018, approximately 155,000 employees, retirees, and their dependents were covered under the prescription drug benefit plan.

19.     Pursuant to Section 1209(9)(f) of the Public Authorities Law, the NYCTA's Board approved a Request for Proposal ("RFP") process for a PBM to administer its prescription drug benefit plan.

20.     The NYCTA first issued its RFP in November 2014.  The NYCTA was assisted by outside consultants selected for their expertise in health benefits, cost modeling, and understanding of union relationships.

21.     The NYCTA's consultants prepared certain RFP documents, assisted with negotiations, provided financial modeling, and analyzed the potential changes in co-pays under each proposal.

22.     Consistent with its existing benefits package, the NYCTA's RFP requested separate pricing for the Commercial Plan, the EGWP plan, and for the Commercial and EGWP plans combined.

23.     On February 6, 2015, the NYCTA received six proposals, including from the incumbent PBM, OptumRx, Inc. ("OptumRX"), and ESI.  The NYCTA's Selection Committee evaluated each proposal in accordance with the criteria in the RFP, which included, among other things, experience and expertise in maintaining a large network of retail pharmacies, ability to replicate and enhance the existing plan design, and customer service capabilities.

24.     On August 24, 2016, following negotiations and oral presentations, the remaining proposers submitted their Best and Final Offers ("BAFOs").  The BAFOs contained detailed pricing, including guaranteed discounts, guaranteed rebates, administrative fees, and dispensing fees.

25.     The NYCTA's consultants used their proprietary financial model to evaluate the detailed pricing contained in the BAFOs and project the NYCTA's net plan costs for four years. According to that model, ESI's BAFO yielded the lowest cost for the Commercial and EGWP plans combined.

26.     The Selection Committee reviewed the BAFOs in accordance with the evaluation criteria and unanimously recommended ESI for award of both the Commercial and EGWP plans.

**THE CONTRACT**

27.     On October 1, 2015, the NYCTA signed a three-year PBM contract with ESI (the "Contract").  The Contract went into effect on April 1, 2016 and expired on April 1, 2019.  ESI thereafter continued in its role as the NYCTA's PBM through May 31, 2019 pursuant to an agreed-upon two-month interim arrangement.  The NYCTA awarded a PBM contract to another vendor, which commenced on June 1, 2019.

28.     Under the Contract, and consistent with PBM practice generally, once a pharmacy filled a prescription and dispensed the drug, it would submit a claim for reimbursement to ESI,

which then processed the claim and reimbursed the dispensing pharmacy.  The NYCTA would

later reimburse ESI for all expenditures made on behalf of its beneficiaries.

29.     The Contract imposed multiple affirmative duties and obligations on ESI that, if

carried out, would have prevented the damages incurred by the NYCTA.

30.     The Contract required ESI to carry out its obligations in a non-negligent manner

consistent with its specialized experience and expertise.  Section 4.1 of the Contract required ESI

to:

> In the exercise of its duties under this Agreement . . . use that
> degree of care and reasonable diligence that an experienced and
> prudent plan administrator of pharmacy benefits under a group
> health plan familiar with such matters would use acting in like
> circumstances, and consistent with industry standards.

Under section 4.1, ESI was obligated to take affirmative and proactive measures in response to

clear indications of fraudulent, abusive, or excessive claims in the data that it received and

reviewed in the ordinary course.

31.     The Contract required ESI not just to pay claims, but to affirmatively review and

investigate them in order to protect the integrity of the NYCTA prescription drug benefit plans.

Section 4.2 of the Contract required ESI to:

> process Claims incurred . . . and provide customer service in a
> prudent and expert manner, including investigating and reviewing
> such Claims to determine what amount, if any, is due and payable
> according to the terms and conditions of the Plan documents and
> this Agreement.

Section 4.2 of the Contract further provided that ESI:

> shall have authority under the Plan for purposes of (i) making
> initial Claims payments and denials under the Plan; (ii) performing
> the fair and impartial review(s) of all appeals of denied Claims;
> and (iii) issuing any required notices to Plan participants.  In
> connection with those duties, [ESI] shall determine what Benefits
> are payable under the Plan, subject to the eligibility and enrollment
> information the [NYCTA] gives to [ESI.]  [ESI] shall be deemed to

> have properly exercised such authority unless it has abused its
> discretion by acting arbitrarily or capriciously.  [ESI] is a fiduciary
> of the Plan for the purposes of appeals to the extent necessary to
> perform its obligations and duties as expressed in this Agreement
> and to the extent that its performance of such appeals constitutes
> fiduciary action.  Contractor shall not act as the plan administrator
> for the Plan in performing its obligations under this Agreement.

The Contract defined Plan Documents as "the summary plan description(s) and any other

documents that are specifically incorporated by reference in the summary plan description(s)."

32.     Under section 4.2, ESI was obligated to affirmatively investigate claims data to

ensure that the NYCTA was not reimbursing any claims that exceeded the scope of its benefit

plan or the terms of the Contract and inform the NYCTA of any irregularities, particularly those

suggesting fraud, abuse, or excess.

33.     ESI also had ongoing internal audit requirements under the terms of the contract.

Section 4.14 of the Contract required ESI to:

> maintain a comprehensive internal audit program for pharmacy
> benefits management services.  During these random, internal
> audits, ESI shall include a review of the delivery of appropriate
> pharmacy benefit management services to Participants in
> accordance with standards in the pharmacy benefit management
> community.

Under section 4.14, ESI was obligated to audit its services to ensure it had adequate procedures

and safeguards in place to identify clear indications of fraudulent, abusive, or excessive claims,

and to stop such activity once it was detected.

34.     The Contract also made ESI responsible for monitoring and managing pharmacy

practices.  Section 4.16 of the Contract required ESI to:

> maintain a Network of Pharmacies throughout the term of this
> Agreement adequate to meet the prescription drug and professional
> pharmacy service needs of Participants. . . . [ESI] shall be solely
> responsible for the selection, monitoring, and retention of its
> Network Pharmacies.  [ESI] represents and warrants that . . . [it]
> has exercised and shall exercise due diligence in the selection and

> retention of Network Pharmacies. . . . Contractor shall maintain . . .
> quality improvement committees and medical directors (i) to
> monitor the quality of prescription drug and professional pharmacy
> services furnished by Network Pharmacies, as well as the quality
> of services [ESI] maintains, and (ii) to direct action as appropriate
> to correct deficiencies.

Under section 4.16, ESI was obligated to: (i) exercise due diligence in its selection and

monitoring of the pharmacies in its network, which at a minimum, required promptly removing

pharmacies engaged in clearly fraudulent activity or otherwise submitting abusive or excessive

claims; and (ii) establish internal committees that ensure the pharmacies in its network provided

adequate quality, including making affirmative changes in response to any identified

deficiencies.

35.     ESI was responsible for overpayments under the Contract.  Section 4.7 of the

Contract made ESI:

> liable for all un-recovered Overpayments due to [ESI's] breach of
> this Agreement (including, without limitation, Contractor's failure
> to meet the standard of care), negligence, willful malfeasance or
> violation of applicable law.

The Contract defined Overpayments as:

> payments that exceed the amount payable under the Plan and this
> Agreement . . .  including, but not limited to . . . an error in the
> administration of coordination of benefits.

Under section 4.7, ESI was contractually liable for all overpayments, including those resulting

from ESI's failure to monitor and respond to clear indications of fraudulent, abusive, or

excessive claims, as well as any other claims that exceeded the scope of the benefit plan or the

terms of the Contract.

36.     Collectively, these Contract provisions imposed a basic fraud detection obligation

on ESI.  ESI represented to the NYCTA, including in a  March 15, 2019 email that summarized

its basic fraud, waste, and abuse obligations, that it "continuously monitors the entire network of

pharmacies for billing discrepancies and possible fraud," and that it provides all of its clients

with standard fraud, waste, and abuse control mechanisms through "a combination of various

core services," including those relating to claims processing and pharmacy management/audits

outlined above.  Through a combination of real-time claims analysis, audits, and even on-site

visits to network pharmacies and in-person pharmacist interviews, ESI represented that its fraud,

waste, and abuse protocols involved an automated review process to detect high risk claims

using a large number of outlier indicators, followed by additional review by ESI's network

auditors.  ESI also maintained a "fraud monitoring & fraud tip hotline," which it purportedly

used to collect and investigate allegations of fraud and abuse by members, network pharmacies,

prescribers, and law enforcement.

        37.    Under the basic anti-fraud obligations contained in the Contract, which by ESI's

own admissions were included in the "core services" detailed above, ESI was required to take

specific and aggressive measures to both detect and prevent fraudulent, abusive, or excessive

claims.  These measures should have included an examination of relevant claims data as they

became available in order to ensure there were no outlier indicators of ongoing fraud warranting

immediate action.

        38.    In addition, section 4.35 of the Contract also provided an "enhanced" fraud,

waste, and abuse program, which required ESI to:

                Upon the AUTHORITY'S request . . . [a]dminister, for the fees set
                forth in Exhibit A, a fraud prevention and detection program,
                including system edits and other procedures to critically examine
                charges for all services that appear abusive, excessive, or fraudulent.

        39.    Exhibit A of the Contract provides that the "enhanced" fraud, waste, and abuse

protection is included for Medicare-eligible retirees serviced by the EGWP (as defined above),

and is available for Commercial Plan beneficiaries at an additional cost.  Accordingly, while the

NYCTA did not purchase any enhanced fraud protection for Commercial plan beneficiaries, the enhanced protection was included for EGWP beneficiaries.

40.     The RFP documents attached to the Contract make clear that the NYCTA requested and expected its incoming PBM to implement basic fraud protection, and that ESI agreed.  In the Scope of Work that the NYCTA provided to ESI during the RFP process, which is attached to the executed Contract, the NYCTA expressly requested that its incoming PBM "administer a fraud prevention and detection program and cooperate with the Authority's efforts to eliminate and prosecute health care fraud."   In its subsequently provided Scope of Work Deviations Worksheet, ESI requested multiple deviations from the Scope of Work, but did not request any deviations from the NYCTA's request for a fraud prevention and detection program.

41.     Moreover, during the same RFP process that led to the NYCTA awarding a PBM contract to ESI, ESI marketed its enhanced fraud, waste, and abuse program as distinct from the standard program included in its core services, which it similarly markets to its full catalogue of clients.  While the basic fraud, waste, and abuse obligations contained in the Contract required ESI to monitor, audit, and investigate claims bearing any indicia of fraud as part of its core services, the enhanced fraud, waste, and abuse program, according to ESI's own promotional materials, uses "advanced analytics, full investigative services, detailed reporting, and expert consultation to help [the sponsor] control costs and curtail inappropriate drug use."

42.     As detailed below, by failing to take the affirmative steps mandated by the Contract terms set forth above in response to clear and ongoing fraud, abuse, and excess, ESI breached its basic and enhanced anti-fraud obligations contained in the Contract and caused tens of millions of dollars in damages to the NYCTA.  In addition, by approving thousands of claims for non-FDA approved prescription drugs that were not covered by the Commercial plan, ESI

further breached the Contract and caused millions of dollars in additional damages to the NYCTA.

**SOARING COMPOUND MEDICATION COSTS**

43.     In the pharmaceutical business, the process of combining, mixing, or altering ingredients to create a medication tailored to the unique needs of an individual patient is called "compounding."  Though not themselves FDA-approved, compound medications are often prescribed when a patient requires an FDA-approved medication in an alternative form (*e.g.*, due to allergies or inability to swallow a tablet or capsule).

44.     The Contract defines a "Compound Prescription" as "a customized medication derived from two or more raw chemicals, powders and devices, of which at least one ingredient is a federal legend drug, approved by the FDA, prepared by a pharmacist according to a doctor's specifications the Prescriber's order and the pharmacist's professional capabilities."

45.     The prices of compound medications are often significantly higher than non-compound alternatives, with price differentials in the tens of thousands of dollars or more. Given these perverse incentives, fraudulent schemes have surfaced involving patients, physicians, and pharmacists filling compound prescriptions and sharing the proceeds.

46.     ESI was well-aware of the growing problem of compound prescription drug fraud before it became the NYCTA's PBM.  As the PBM for Tricare, the federal government's health insurance program for military members and their families, ESI knew in 2015 that: (i) Tricare's compound prescription drug expenditures had more than tripled from 2014 to 2015; and (ii) federal prosecutors were conducting a criminal investigation related to those compound claims. On February 24, 2016, more than a month before ESI's Contract term with the NYCTA began, two individuals were indicted on fraud and conspiracy charges involving $65 million in

fraudulent compound claims billed to Tricare. By October 2016, ten more individuals were charged for participating in the same scheme, and the fraudulent claims had grown to $100 million.

47.     In a pattern that mirrored Tricare's experience with ESI, the NYCTA's compound prescription expenditures rose precipitously after ESI took over as the NYCTA's PBM. Prior to April 2016, the NYCTA paid approximately $500,000 per month in compound claims; by March of 2017, the NYCTA's monthly compound spending peaked at $8.8 million.

48.     The NYCTA noticed the rapidly rising costs of compound medications early in the Contract term and brought the issue to ESI's attention. In June of 2016, three months into the Contract, the NYCTA contacted ESI about a single individual's claim for an erectile dysfunction compound that totaled $405,326.43 over three months.

49.     Upon notification by the NYCTA, ESI assured the NYCTA that it would take steps to alleviate the NYCTA's concerns over compound spending, including reporting the claims to ESI's "Fraud Tip Line" and alerting the "Director of Program Integrity." The NYCTA also requested that ESI provide detailed reporting on compound prescriptions and pursue recovery of any illegitimate compound claims.

50.     While the claim for the erectile dysfunction compound was later discovered to be non-fraudulent, ESI was on notice that the NYCTA wanted close inspection of compound claims under the Contract. ESI was also on notice of the already-existing compound prescription drug fraud problem due to its experience as Tricare's PBM.

51.     In July 2016, ESI prepared a presentation on their compound management program (the "Compound Program"). Under ESI's Compound Program, compound

prescriptions would be limited to pre-approved ingredients.  If the requested compound

contained any excluded ingredients, prior authorization from ESI would be required.

52.     In order to obtain prior authorization, the prescribing physician, pharmacist, or the

plan beneficiary would have to call ESI.  After the caller would be verified, ESI's prior

authorization representative would reviewe the request.  If the request were denied, an ESI

pharmacist would have to affirm or overrule the representative's denial.

53.     ESI's Compound Program proposal was an off-the-shelf solution that posed

problems for the NYCTA.  In an order on December 16, 2004, an arbitrator had ruled that the

NYCTA's unilateral implementation of prior authorization measures violated governing

collective bargaining agreements because they constituted a reduction in the level of benefits

contemplated by the parties.  Accordingly, the NYCTA informed ESI that its Compound

Program was not then a feasible solution because it might lead to a grievance and present issues

under the collective bargaining agreement.  ESI proposed no other solution.

54.     Despite the NYCTA's complaints and ESI's assurances, compound spending

continued to grow in 2016 and 2017.  On March 28, 2017, the NYCTA's consultants informed it

that a single pharmacy in Utah, called Fusion Pharmacy ("Fusion"), was responsible for $20

million dollars of the NYCTA's compound bill, including $12 million over a nine-month period

in 2016.

55.     In April of 2017, the NYCTA instructed ESI to block all prescription claims by

Fusion.  Prior to being notified by the NYCTA, ESI neither identified the Fusion claims nor took

any steps to prevent them.

56.     The $12 million that the NYCTA paid to Fusion in 2016 was double the NYCTA's entire compound expenditure for 2015.  The NYCTA's total compound expenditures for the nine-month period in 2016 was $22 million.

57.     The basic fraud obligations contained in the Contract required ESI to detect and address these obvious outlier indicators.  If ESI actually reviewed the claims data at all—which, on its own admission, it was obligated to do under its basic anti-fraud obligations—the fact that a single pharmacy filled $20 million worth of compound prescriptions would have (or should have) raised instant red flags.  But despite the fact that even a cursory review of real-time claims data should have triggered a meaningful response, ESI failed to detect or address this extraordinary level of Fusion claims.

58.     The NYCTA's total compound expenditures for the first half of 2017 was $30 million.  In June of 2017, the NYCTA requested additional reporting and data from ESI on prescription drug expenditures.

59.     In January of 2018, the NYCTA learned that a single California orthopedic surgeon, Dr. Mitchell Cohen, was responsible for prescribing $20 million of compound medications paid by the NYCTA in 2016.  The NYCTA subsequently learned that, less than two years before, on December 15, 2015, prior to writing the compound medications to NYCTA plan participants in 2016, Dr. Cohen had pleaded guilty to federal fraud charges arising out of a workers' compensation kickback scheme.  ESI did not inform the NYCTA of this fact and took no action with regard to this corrupt physician.

60.     Despite being aware of these extraordinary and ongoing compound costs involving a single pharmacy and a single physician, ESI failed to take proactive measures to block the physician from prescribing further prescriptions, block the pharmacy from further

filling them, and/or inform the NYCTA of these clear indications of abusive, excessive, or fraudulent claims.  As a result, the Fusion and Cohen-related claims continued to accumulate through 2016 and 2017.

61.    On January 25, 2018, the NYCTA instructed ESI to block all prescription claims authorized by Cohen.  ESI did not block prescription claims authorized by Cohen until February 13, 2018, by which time Cohen had filled more fraudulent prescriptions.

62.    During 2017 and 2018, the NYCTA directed ESI to block 35 pharmacies and 27 physicians from fulfilling claims for NYCTA members.

63.    On March 2, 2018, Christopher Frusci, a bus driver from Staten Island, pleaded guilty in the United States District Court for the District of New Jersey to his involvement in a conspiracy to defraud the NYCTA's health insurance plan and other insurers out of $5 million by using fraudulent claims for compounded medications marketed by "Company A."  To secure false compound prescriptions, Company A and sales representatives, like Frusci, referred health care plan beneficiaries to telemedicine physicians paid by Company A or its affiliates.

64.    On June 27, 2018, Enver Kalaba, an NYCTA employee, pleaded guilty to participating in the same compound prescription fraud scheme.  Kalaba, who was recruited by Frusci, admitted that, from April 2016 through August 2017, he conspired to defraud the NYCTA's health benefits plan by filing fraudulent claims for medically superfluous compound prescriptions.  Kalaba paid health plan beneficiaries $100 for each false prescription.  To ensure physicians prescribed compound medications regardless of medical necessity, Kalaba referred health care plan beneficiaries to telemedicine physicians who were paid by Company A.

65.     On information and belief, dozens of additional individuals, pharmacies, and physicians have participated in the same or similar fraudulent schemes involving compound medication claims paid for by the NYCTA during the Contract term with ESI.

**APPROVAL OF NON-FDA APPROVED MEDICATIONS**

66.     In addition to its failure to prevent tens of millions of dollars in fraudulent prescription drug claims, ESI also approved thousands of claims for non-FDA approved medications that were outside the scope of the NYCTA prescription drug benefit plan ESI was tasked to administer.

67.     The prescription drug benefit summary plan description, which the Contract expressly incorporates, required covered medications to be FDA-approved.

68.     Despite this requirement, ESI approved millions of dollars in non-FDA approved prescription drug claims, including approximately $3.2 million in 2017 alone according to an audit conducted by the NYCTA's consultants.

**TRANSITION TO A NEW PBM**

69.     During the period that ESI served as the NYCTA's PBM, prescription drug reimbursement claims paid to NYCTA employees and retirees exceeded the NYCTA's spending projections—and for a time, vastly so—due to the volume of compound prescription drug claims approved by ESI, many of which the NYCTA and others subsequently determined to be fraudulent claims.

70.     Due to these exceedingly high contract costs overruns and the MTA's dire financial condition, as well as the critical importance of ensuring employee health and safety, the MTA declared an emergency that made formal competitive bidding impractical and inappropriate as provided in guidelines adopted pursuant to New York Public Authorities Law § 2879.

71.     Because of that emergency finding and the procurement procedures it specifically invoked, the MTA issued requests for proposals to two other industry-leading PBM providers, OptumRX and CVS Health.  The MTA selected CVS Health as its new PBM manager due to its implementation plan, account management staff, reporting capabilities, and lower costs.

72.     ESI has sought to enjoin the MTA from contracting with CVS Health to provide prescription benefit management services to its employees, its employees' families, and retirees.

## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

73.     The NYCTA repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

74.     The NYCTA has performed all of its obligations under the Contract.

75.     As a result of its failure to identify and respond to obvious indications of fraud reflected in the claims data that it collected and monitored, and its resultant failure to prevent the accumulation of fraudulent prescription drug claims, ESI has breached Section 4.1 of the Contract by failing to use that degree of care and reasonable diligence that an experienced and prudent plan administrator of pharmacy benefits under a group health plan familiar with such matters would use acting in like circumstances, and consistent with industry standards.

76.     The NYCTA has suffered damages as a direct and proximate result of ESI's breach of contract.

## SECOND CAUSE OF ACTION
## (BREACH OF CONTRACT)

77.     The NYCTA repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

78.     The NYCTA has performed all of its obligations under the Contract.

79.     As a result of its failure to identify and respond to obvious indications of fraud reflected in the claims data that it collected and monitored, and its resultant failure to prevent the accumulation of fraudulent prescription drug claims, as well as its approval of non-FDA approved medications that were not covered by the NYCTA prescription drug benefit plan, ESI has breached Section 4.2 of the Contract by failing to process prescription drug claims and provide customer service in a prudent and expert manner, including investigating and reviewing such claims to determine what amount, if any, is due and payable under the Plan Documents and the Contract.

80.     The NYCTA has suffered damages as a direct and proximate result of ESI's breach of contract.

**THIRD CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

81.     The NYCTA repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

82.     The NYCTA has performed all of its obligations under the Contract.

83.     As a result of its failure to identify and respond to obvious indications of fraud reflected in the claims data that it collected and monitored, and its resultant failure to prevent the accumulation of fraudulent prescription drug claims, ESI has breached Section 4.14 of the Contract by failing to maintain a comprehensive internal audit program for pharmacy benefits management services, including failing to review the delivery of appropriate pharmacy benefit management services to the NYCTA in accordance with standards in the pharmacy benefit management community.

84.     The NYCTA has suffered damages as a direct and proximate result of ESI's breach of contract.

## FOURTH CAUSE OF ACTION
## (BREACH OF CONTRACT)

85.     The NYCTA repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

86.     The NYCTA has performed all of its obligations under the Contract.

87.     As a result of its failure to identify and respond to obvious indications of fraud reflected in the claims data that it collected and monitored, and its resultant failure to prevent the accumulation of fraudulent prescription drug claims, ESI has breached Section 4.16 of the Contract by failing to exercise due diligence in the selection, monitoring, and retention of its network pharmacies, and by failing to direct appropriate action to correct obvious deficiencies.

88.     The NYCTA has suffered damages as a direct and proximate result of ESI's breach of contract.

## FIFTH CAUSE OF ACTION
## (BREACH OF CONTRACT)

89.     The NYCTA repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

90.     The NYCTA has performed all of its obligations under the Contract.

91.     As a result of its failure to identify and respond to obvious indications of fraud reflected in the claims data that it collected and monitored, and its resultant failure to prevent the accumulation of fraudulent prescription drug claims, as well as its approval of non-FDA approved medications that were not covered by the NYCTA prescription drug benefit plan, ESI has breached Section 4.7 of the Contract by failing to reimburse the NYCTA for claims that exceed the amount payable under its benefit plan and the Contract.

92.     The NYCTA has suffered damages as a direct and proximate result of ESI's breach of contract.

### SIXTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

93.     The NYCTA repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

94.     The NYCTA has performed all of its obligations under the Contract.

95.     As a result of its failure to identify and respond to obvious indications of fraud reflected in the claims data that it collected and monitored, and its resultant failure to prevent the accumulation of fraudulent prescription drug claims, as well as its approval of non-FDA approved medications that were not covered by the NYCTA prescription drug benefit plan, ESI has breached Section 4.35 of the Contract by failing to administer an "enhanced" fraud prevention and detection program for the EGWP plan beneficiaries, including system edits and other procedures to critically examine charges for all services that appeared abusive, excessive, or fraudulent.

96.     The NYCTA has suffered damages as a direct and proximate result of ESI's breach of contract.

*[Remainder of page intentionally left blank]*

## DEMAND FOR RELIEF

**WHEREFORE**, the NYCTA demands:

1. Damages in an amount to be proven at trial;

2. Its costs of suit; and

3. Such other and further relief that the Court deems just and proper.

Dated: July 30, 2019                                     **BAKER & HOSTETLER LLP**

By: _____*/s/ John Siegal*_____
                                           John Siegal
                                           Maximillian S. Shifrin

45 Rockefeller Plaza
New York, New York  10111
Tel: 212.589.4200
Fax: 212.589.4201

*Attorneys for Plaintiff*
*New York City Transit Authority*