# Exhibit 2

**In the Matter Of:**

*NYCTA vs*

*Express Scripts*

---

*SUSAN HAYES*

*February 19, 2021*

---



1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5   NEW YORK CITY TRANSIT      )
     AUTHORITY,                 )
 6                              )   Case No. 1:19-cv-05196
             Plaintiff,         )
 7                              )
     VS.                        )
 8                              )
     EXPRESS SCRIPTS, INC.,     )
 9                              )
             Defendant.         )
10

11

12            ORAL AND VIDEOTAPED DEPOSITION
                          OF
                     SUSAN HAYES
13               FEBRUARY 19, 2021

14

15

16

17

18

19

20

21

22

23

24

25
```

23

```
 1   did.

 2            If I did, it wasn't -- it doesn't

 3   stick in my head.

 4        Q.   And I'll tell you, Ms. Hayes, it's

 5   not identified on Exhibit A.

 6            Does that tell you that you didn't

 7   look at his deposition?

 8        A.   Yeah.  I -- yeah.  I don't recall

 9   it.

10        Q.   So I feel like we were talking over

11   each other a little bit.

12            If it's not listed on Exhibit A, is

13   it a fair statement that you did not review

14   the deposition of Jim Masella?

15        A.   Correct.

16        Q.   And I noticed on Exhibit A that

17   there's not a deposition of anybody from

18   NYCTA.

19            Is it fair -- that you didn't

20   review any of the depositions of the NYCTA

21   witnesses?

22        A.   It is fair to say that, yes.

23            MS. HELLMANN:  Beth, let's go ahead

24        and mark Exhibit 116, please.

25            (Exhibit No. 116 Marked.)
```

47

1   client, is that set forth in the contract

2   between you and your client?

3        A.   Yes, ma'am.

4        Q.   And tell me the algorithms.

5             What -- what are some of the things

6   that you're looking for in -- in running this

7   data?

8        A.   Well, we have very sophisticated

9   algorithms.  I'm a criminologist, so we use

10  criminological theory as a basis of our

11  algorithms.

12            And one of those theories, the

13  differential association theory, says that,

14  basically, white collar crime is learned from

15  other white collar criminals.

16            And so we look at the density of

17  the relationship between the prescriber, the

18  pharmacy, and then sometimes the patient.

19            So we look at that relationship.

20  That is heavily weighted.

21            So we score both pharmacies and

22  claims, and that's heavily weighted on the

23  pharmacy side.

24            And then we're also looking at

25  attributes within in the claim that are

48

1    standard deviation from the mean.

2              And so basically we have, for lack

3    of a better word, a means table for every NDC

4    and every DPI that runs through our system.

5              And so the computer scores it for a

6    standard deviation from that mean.

7              So, you know, let's just take age,

8    for example.  You wouldn't see a

9    seven-year-old getting Botox or cholesterol

10   control medication.

11             And so we're looking at the

12   standard deviation from the mean on certain

13   attributes of the claim.

14             So between the pharmacy and the

15   claim, an aggregate score is produced.  And

16   then, as I said, we take the top-scored claims

17   and then audit those.

18        Q.   Okay.

19        A.   So it's targeted from the viewpoint

20   of potential fraud, waste or abuse and it's

21   not targeted to any given pharmacy.

22        Q.   Okay.

23             And that's helpful.

24             So you're taking one client's data

25   and you're looking at all of these different

49

1    factors for that -- for all of that client's

2    data; is that correct?

3          A.   Yes, ma'am.

4          Q.   The contract that you have with

5    your client, does that dictate how you're

6    going to perform this process?

7          A.   Yes.   There is a statement of work

8    I have in our contracts that dictates exactly

9    that.

10          Yes.   It doesn't -- I don't think

11   it gets down to the statistical weighting of

12   each one of those but, in general, it's just

13   what I've explained.

14          Q.   Okay.   Thank you.

15          This might seem like a basic

16   question, but I'm going to ask it.

17          In performing these services for

18   your clients, do they pay you a fee?

19          A.   Yes.   Yes, they do.

20          Q.   The -- the system that you have

21   that you run the claims through, did you use

22   that at all in coming up with your opinions in

23   this case?

24          A.   No, because I did not receive

25   claims data, detailed claims data.

1      Q.   Okay.

2      A.   The whole -- you know, over a long

3  period of time, no.

4      Q.   I'm sorry.  Say that again.

5           What long period?

6      A.   No, I did not -- I did not run them

7  through our system.  No, I did not.

8           I used some of the same principles

9  in analyzing some of the information that I

10  saw, but I did not run them through our

11  system, no.

12      Q.   And you indicated that you didn't

13  have detailed claims data.

14           At some point did you get detailed

15  claims data for the NYCTA plan?

16      A.   Yes.  I did get detailed claims

17  data, yes.

18      Q.   And at that point did you run any

19  of it through your system -- your -- the

20  claims analysis system that you have?

21      A.   No, I did not.

22      Q.   Is there any reason why you didn't?

23      A.   No, there's no reason why I didn't,

24  other than -- other than our system is

25  extremely complicated and there's a lot of

51

1    rules around the data that would preclude me

2    from doing this on a one-off basis.

3         Q.   Understood.

4              So --

5         A.   We take -- we take at least

6    90 days, if not, at times, 6 months, to

7    implement a client.  It's not a project we

8    take lightly when we have a new client come on

9    board.

10             So it's not like we can just jam it

11   into the system and hope it works correctly.

12   We do a lot of testing.  So it's not something

13   that you do on a one-off basis.

14        Q.   Understood.

15             In terms of your business, Pharmacy

16   Investigators & Consultants, who are -- for

17   lack of a better term, who are your

18   competitors in the marketplace?

19        A.   Well, on the benefits consulting

20   side we have many competitors, you know,

21   starting at, you know, the -- the top

22   consulting firms, you know, in America, you

23   know, Mercer, Aon, Towers, Watson.

24             So starting at that level, all the

25   way down to small -- you know, would I

58

1              (Pause.)

2              Were you able to open that?

3       A.    Yeah, I'm opening it.  I'm just

4   trying to move it now.

5              Yes, I have it.

6       Q.    I've handed you what's been marked

7   as ESI Exhibit 117.

8              And, for the record, it's Bates

9   labeled Express Scripts 1095-351.

10             And this was a document, according

11  to your report, that you reviewed and you

12  actually reference on Page 16 of your report.

13             Do you remember this document?

14      A.    Yes, ma'am.  I do.

15      Q.    And what is your understanding as

16  to the types of fraud, waste and abuse

17  services Express Scripts offers its clients?

18      A.    My understanding is that they

19  offer, if you will, kind of a basic Fraud,

20  Waste and Abuse Program, and then they offer

21  an Enhanced Fraud, Waste and Abuse Program.

22      Q.    And is that consistent among other

23  PBMs in the industry?

24      A.    I'm not sure.  That was not in the

25  scope of what I was asked to do in this case.

59

1    I have not looked at every PBM's Fraud,

2    Waste & Abuse Program.

3         Q.   And I think you refer to the base

4    Fraud, Waste & Abuse Program.

5              Is that what's referred to under

6    the "Pharmacy Fraud Monitoring and

7    Investigations" on Exhibit 117?

8         A.   Hold on.

9              Where -- where is 117?

10        Q.   It's Exhibit 117.  It's what we --

11        A.   Tab 15?

12        Q.   Yes.

13        A.   Tab 15.  Okay.

14             All right.

15             And where did you say that was?

16        Q.   Sure.

17             Do you see where it says, "Base

18   Fraud Monitoring & Fraud Tip Hotline"?

19        A.   I -- I do see that, yeah.

20        Q.   Okay.

21             And then if you go down a section,

22   do you see where it says, "Pharmacy Fraud

23   Monitoring and Investigations"?

24        A.   Yes.  I do.

25        Q.   Okay.

62

1          THE REPORTER:  I didn't hear you.

2          MS. HELLMANN:  Thank you.

3          Q.  (BY MS. HELLMANN)  So as part of

4  their investigations of pharmacies, Express

5  Scripts will reach out to prescribers and

6  members, correct?

7          A.    Correct.

8               I mean, that's what it says right

9  here, right?

10          Q.    Correct.

11          A.    Yes.

12          Q.    And -- and tell me what you

13  understand the Enhanced Fraud, Waste & Abuse

14  Program to be.

15          A.    I believe that's a program that is

16  more targeted to -- excuse me -- the specific

17  utilization of a given client.  So a client

18  can buy up that service.  So it's the

19  utilization of that specific client.

20          Q.    The Enhanced Fraud, Waste & Abuse

21  service that Express Scripts offers, looking

22  at physicians and members?

23          A.    Well, I think in the same way the

24  base program looks at prescribers and members.

25          Q.    Is it your understanding that the

65

1          So...

2     Q.   And this document goes on to

3   describe that, as part of this program,

4   certain reports are proactively generated,

5   correct?

6     A.   Yes.  That's what it says here.

7   Sample reports are proactively generated.  It

8   says exactly that.

9     Q.   You understand -- I think you

10  actually testified that there was an

11  additional fee if clients wanted to be

12  enrolled in the Enhanced Fraud, Waste & Abuse

13  Program, correct?

14    A.   Yes.

15    Q.   What's your understanding as to

16  whether New York City Transit was enrolled in

17  the Enhanced Fraud, Waste & Abuse Program?

18    A.   They not were enrolled in that.

19    Q.   Do you know why Transit did not

20  enroll in the Enhanced Fraud, Waste & Abuse

21  Program?

22    A.   I do not, other than I think they

23  had union -- concerns with the union about

24  enrolling in such a program.

25    Q.   And what's the basis that they had

66

```
 1   concerns with the union for enrolling in the

 2   program?

 3        A.   I didn't -- I just made that as an

 4   assumption of what was told to me by

 5   Mr. Shifrin.

 6        Q.   I know earlier you testified that

 7   you didn't read the deposition of Jim Masella.

 8             Do you know who Mr. Masella was for

 9   New York City Transit?

10        A.   I think he was in charge of their

11   benefits programs.

12        Q.   And in coming up with the opinions

13   that you've opined upon and that are contained

14   in your supplemental report, would

15   Mr. Masella's testimony have been relevant to

16   you?

17             MR. SHIFRIN:  Objection.

18             THE WITNESS:  I formed my opinion

19        without -- I felt that I formed my

20        opinion looking at the documents that I

21        looked at and did not need to consider

22        his opinion -- or his testimony.  I'm

23        sorry.

24        Q.   (BY MS. HELLMANN)  If Mr. Masella

25   testified that the reason New York City
```

79

1        Q.    So can you tell me specifically

2    what Express Scripts did or did not do that

3    you believe was inconsistent with industry

4    standards?

5        A.    Yes.

6        Q.    Okay.

7              And if it's a list, I might stop

8    you, but why don't you just go ahead and tell

9    me.

10       A.    Well, as my opinion states, I

11   believe ESI should have very quickly ended the

12   relationship with New York City Transit

13   Authority, warned them -- warned them, brought

14   it to their attention -- whatever words you

15   want to use -- that there was a spike in

16   compound utilization, and that this was

17   outside their geographic area -- the pharmacy

18   was outside the geographic area.

19       Q.    And -- and when you say "the

20   pharmacy," are you referring to Fusion

21   Pharmacy?

22       A.    I am.

23       Q.    Is there anything else that you

24   believe Express Scripts did or did not do that

25   you believe was inconsistent with the industry

80

1    standard?

2         A.   In "Opinion One" or in other

3    opinions?

4         Q.   In other -- we can go through each

5    one of them.  I'm looking for all of your

6    opinions.

7             What did Express Scripts do or did

8    not do that you believe was inconsistent with

9    what other reasonable and prudent PBMs would

10   do in the industry standard?

11        A.   Well, first of all, they should

12   have let New York City Transit Authority know

13   that there was a spike in compound

14   utilization.

15           There was not necessarily a fraud,

16   waste and abuse failure at that point, but it

17   was certainly an account management failure at

18   that point.

19           So early on in the relationship,

20   they should have said, "Hey, there's a lot of

21   compounds going on here."

22           These are -- this is most unusual.

23   As I point out, compounds are generally about

24   one percent of the utilization.  This was, you

25   know, much more than one percent of the

81

1    utilization.

2            And that they should have let New

3    York City know what to do and consulted with

4    them about what to do.

5            So let them know this is what's

6    going on and then, you know, consult with them

7    about what to do about it.

8            And then further, if you want to,

9    you know, go into Opinion Two briefly, once

10   that was known and done, then, you know, ESI

11   should have done a better job of monitoring

12   Fusion and really investigating Fusion.

13           And so that was a fraud, waste and

14   abuse failure.

15           And then my Opinion Three is

16   basically that they didn't do this because

17   there was a financial incentive not to do

18   that.

19           So, in essence, that's my report.

20       Q.   Okay.

21           So I want to break --

22   (communications breakup/inaudible) -- down a

23   little bit.

24       A.   You want to what a little bit?  You

25   broke up.

85

1          With respect to bringing to New

2    York City Transit's attention that the

3    compound spike -- I think is how you referred

4    to it -- what is the industry standard for

5    this action, or inaction?

6          A.   Well, as I mentioned in my report,

7    typically what happens, you know, with PBMs

8    and their clients is that they meet on a

9    periodic basis, whether that be monthly,

10   quarterly -- usually no -- no less frequent

11   than quarterly -- but they would meet and

12   discuss top drugs -- top drugs and top drug

13   categories that are causing the top cost for

14   members, and they would discuss ways to

15   mitigate those costs.

16          That is really the whole point of

17   quarterly meetings between PBMs and their

18   clients, is to talk about what's going on with

19   a plan, either what's going on with drug

20   utilization, what's going on with members,

21   what's going on with prescribers and

22   pharmacies, and what PBMs can do to better

23   manage costs on behalf of that given client,

24   given that particular client's needs and, you

25   know, what they have available to them.

86

1        Q.   So tell me, with respect to

2   bringing it to their attention with respect to

3   these meetings, what did the industry standard

4   require that Express Scripts do?

5        A.   I'm debating the word "require."  I

6   don't think that there's a, you know, etched

7   in stone, a manual that requires PBMs to do

8   certain things at these account management

9   meetings.

10            But there's certainly an industry

11   expectation that what's discussed at these

12   quarterly meetings are the utilization and

13   what can be done to prevent unusual or

14   excessive utilization of -- of a prescription

15   drug program.

16            I mean, that's really the "M" in

17   management, the PBM, the management.  They're

18   supposed to be managing those prescription

19   drug costs.  Hence they're called, PBMs,

20   Prescription Benefit Managers.

21            So PBMs are -- their role is to

22   manage the costs of a prescription drug

23   program and advise clients on how to better

24   manage the prescription drug program.

25        Q.   And with respect to --

87

1    (communications breakup/inaudible) --

2    quarterly meetings, I think you said, or

3    monthly meetings, that talk about -- that talk

4    about drug utilization, prescribers,

5    et cetera, is it your opinion that such

6    meetings are required -- that the industry

7    standard requires such meetings?

8         A.   Yes.  I would say that industry

9    standards require such meetings.

10        Q.   And tell me --

11             (Simultaneous speaking.)

12        A.   As I said -- as I said, there's

13   nothing -- you can't go to some, you know,

14   document that says -- or legislation that

15   requires -- you know, there's no legal

16   requirements.

17             But certainly there's an

18   understanding in the industry that your PBM

19   will meet with you periodically -- and

20   certainly quarterly is a reasonable

21   expectation -- and that they will discuss with

22   you what the utilization of the plan is and

23   ways to better manage that utilization.

24             Yes, that's what the industry

25   standards would require.

88

1        Q.   And I think you already said

2   there's no articles that -- that indicate that

3   this is the industry standard; is that

4   correct?

5        A.   There might be.  I have not done

6   research on that.

7        Q.   You're not aware of any articles

8   that require these meetings that you talked

9   about or that indicate that these meetings are

10  an industry standard?

11       A.   I don't have -- I have not done

12  research on that.

13            There probably are articles about

14  managing Prescription Drug Programs and these

15  quarterly meetings.  Because I could tell you

16  every client I've had in 25 years, we've had

17  quarterly meetings with the PBM involved.

18       Q.   Are there any studies that you know

19  about that looked at how often PBMs meet with

20  their clients?

21       A.   I would have to do additional

22  research on that.  No, I have not done that.

23            It's just so predominant in the

24  industry, I don't think anyone needs to

25  prescribe it.  No pun intended.

 1  the compound spend.

 2          Is that your opinion?

 3      A.   Yes.

 4      Q.   And -- and what's your basis of the

 5  industry standard required Express Scripts to

 6  come up with a reasonable solution to the

 7  compound spend?

 8          MR. SHIFRIN:  Object to form.

 9          THE WITNESS:  I think my -- my

10      statement was that whatever problem

11      there was with a client -- if there are

12      problems, increased spend in a certain

13      category -- that the PBM and the client

14      typically discuss those and -- and come

15      up with remedies or solution that is

16      would mitigate, if possible, those

17      situations.

18          For example, let's just say it's

19      another client that had maybe a high

20      diabetic spend.  They might talk about a

21      wellness program or, you know, campaign

22      on dieting and, you know, healthy

23      living, type thing.

24          So I've sat in many a meeting where

25      we've discussed top spend categories

1           like diabetes and rheumatoid arthritis

2           and other various top spend categories.

3           Q.   (BY MS. HELLMANN)  Have you ever

4      sat in a meeting between a PBM and a client

5      regarding high compound spend?

6           A.   Yes.

7           Q.   What were -- what were some of the

8      solutions that were discussed?

9           A.   Either blocking compounds at some

10     level, some dollar level, or prior-authorizing

11     those, or eliminating the pharmacy from the

12     network.

13          Q.   Did Express Scripts talk to New

14     York City Transit about blocking compounds at

15     some level?

16          A.   I -- I believe they did.  But

17     because of union issues, which is what I

18     confused before, they weren't allowed to block

19     drugs at a certain level.

20          Q.   Did Express Scripts talk to New

21     York City Transit about prior authorizations

22     for compounds?

23          A.   I --

24               (Simultaneous speaking.)

25               MR. SHIFRIN:  Objection.

92

1              THE WITNESS:  -- (inaudible) --

2              Go ahead, Max.  I'm sorry.

3              Are you done?

4              MR. SHIFRIN:  Go ahead.

5              Object to form.

6              Sorry.  Go ahead.

7              THE WITNESS:  I -- I don't recall.

8         I do -- I do believe that there was some

9         discussion regarding prior

10        authorizations, yes.

11        Q.   (BY MS. HELLMANN)  Did Express

12   Scripts talk to New York City Transit about

13   blocking pharmacies or eliminating pharmacies

14   from New York City Transit's network?

15        A.   I did not see any evidence of that.

16        Q.   You didn't see any evidence in all

17   the documents you reviewed about Express

18   Scripts talking to New York City Transit about

19   blocking or eliminating pharmacies?

20             Is that your testimony?

21             MR. SHIFRIN:  Sarah, can you

22        clarify the scope of the question?

23             Because I think there might be some

24        confusion there.

25             But go ahead.

94

1        Q.   Well, I guess that's my question.

2            Do you believe that there's

3    something else that Express Scripts failed to

4    mention or a recommendation Express Scripts

5    failed to make to assist New York City Transit

6    with its compound spend?

7        A.   I believe what they offered was

8    their compound program, and New York Transit

9    Authority could not do that because of their

10   union bargaining -- union bargaining

11   agreements.

12       Q.   And so my question is:  Do you have

13   an opinion as to whether Express Scripts

14   should have come up with a different solution

15   or offered something else to New York City

16   Transit?

17       A.   Yes.

18       Q.   And what should Express Scripts

19   have done?

20       A.   They should have eliminated Fusion

21   from the network.

22       Q.   Okay.

23            So this is -- your opinion is that

24   they should they have eliminated Fusion from

25   the network.

95

1           Any other steps that Express

2   Scripts should have taken or recommendations

3   that it should have made with respect to New

4   York City Transit's compound spend?

5        A.   Well, when -- or -- when?

6             Early on in the relationship when

7   they first saw it, or later on in the

8   relationship?

9             Or when -- when are you --

10       Q.   At any point.

11       A.   Well, as I've testified, they

12  should have brought it to their attention.

13  They should they have discussed it and they

14  should have come up with a strategy to

15  eliminate this level of compound spending.

16       Q.   And what is the strategy Express

17  Scripts should have come up with?

18            Do you have --

19            (Simultaneous speaking.)

20       A.   Elimi- --

21       Q.   Do you have an opinion?

22       A.   Yes.

23            Eliminating Fusion from the -- from

24  the network.  Yes.

25       Q.   Any other strategies that

96

1    Express Scripts should have come up with or

2    recommended?

3         A.   No.  I think that would have taken

4    care of the problem here.

5         Q.   When should Express Scripts have

6    brought Fusion to New York City Transit's

7    attention?

8         A.   Very early on in the relationship;

9    April, May, June of 2016.

10        Q.   Do you have an opinion as to

11   whether Express Scripts raised New York City

12   Transit's compound utilization timely with New

13   York City Transit?

14        A.   I do not think it was timely.

15        Q.   You mentioned that --

16             MS. HELLMANN:  Well, let me strike

17        that.

18        Q.   (BY MS. HELLMANN)  When was the

19   contract effective between Express Scripts and

20   New York City Transit?

21        A.   April 2016, I believe.  I can -- I

22   can -- should probably consult, but I think

23   that's -- that's my recollection.

24        Q.   And it's your testimony that

25   Express Scripts should have raised Fusion with

105

```
 1              Is that --

 2      A.   Yes, right.

 3      Q.   Who at Aon prepared them?

 4      A.   Oh, gosh.

 5           I can't remember her name.  I would

 6 have to look.

 7      Q.   Did you talk with anyone at Aon

 8 about these charts?

 9      A.   No.

10      Q.   Did you review any Aon testimony

11 regarding these charts?

12      A.   No.

13      Q.   When did Aon prepare the charts?

14      A.   I would have to look back.  I -- I

15 have to look back and see -- see -- look

16 exactly back to the original documents.

17      Q.   Do you know what year it was?

18      A.   Yeah.  It was -- it was not early

19 on in the relationship.  It was later in the

20 relationship.

21      Q.   Okay.

22           Do you know --

23           (Simultaneous speaking.)

24      A.   I would --

25      Q.   -- what year?
```

107

1   can read here, is that they prepared it to

2   discuss with NYTA (sic) a compound drug

3   analysis.

4           Q.   Do you know if anyone requested

5   that Aon prepare these charts?

6           A.   I believe Aon and NYCTA discussed

7   this, and these were prepared and presented.

8           Q.   And, again, you don't know why that

9   they were prepared and presented, though,

10  correct?

11          A.   No.

12               But I can assume it's because,

13  obviously, the ESI reports were showing

14  excessive compound utilization and this was a

15  drill-down as to what was going on.

16          Q.   Did you review any of the Optum

17  data in connection with preparing your report?

18          A.   No.

19          Q.   How did Aon have the data to

20  prepare these charts?

21          A.   I would assume ESI gave it to them.

22          Q.   Do you know how often Aon received

23  the data from Express Scripts?

24          A.   No.

25          Q.   Did you review the contract between

1    Aon and NYCTA?

2         A.   No.

3         Q.   Do you have any understanding as to

4    what obligations Aon had with respect to

5    advising NYCTA?

6         A.   No.

7         Q.   I understand you didn't review any

8    of the Optum data that is supposedly reflected

9    in these charts.

10             Did you review any of the

11   underlying Express Scripts data that is

12   reflected in these charts?

13        A.   No.

14        Q.   Did you do any type of testing to

15   determine that the numbers in these charts are

16   accurate?

17        A.   No.

18        Q.   You stated that the charts were

19   prepared in February of 2018.

20             I guess -- is it a look-back type

21   of chart, to look back at over a period of

22   time?

23        A.   Well, that certainly seems like

24   what it appears to be.

25        Q.   I guess, fair, that you don't know

111

1   done?

2        A.   Well, we -- we talked about the

3   fact that prescribers and pharmacies were

4   eliminated from the network.

5        Q.   Do you know whether Express Scripts

6   had access to the Optum data in order to

7   compare the spend under Optum as compared to

8   Express Scripts?

9        A.   I don't know that, but it is

10  typical that a PBM provides the new PBM claims

11  data.  But I don't know.

12       Q.   Did you do any analysis in

13  preparing your report to see how Transit's

14  compound data compared to the data of other

15  Express Scripts' clients?

16       A.   No.

17            I did look at data, but I didn't

18  look at how it compared to other ESI clients,

19  no.

20       Q.   And what's the data you looked at?

21       A.   I was provided data in this case,

22  claims data in this case.

23       Q.   You didn't -- you didn't use any of

24  that claim data to verify the accuracy of any

25  of the charts that are contained in your

112

1    report, true?

2         A.    True.  Not these charts, correct.

3         Q.    And -- and you didn't do any

4    testing or validation of the charts that are

5    contained in your report, correct?

6         A.    No.  I assumed that they were

7    produced under subpoena, they were correct.

8         Q.    When you say that they were

9    produced under subpoena --

10             (Simultaneous speaking.)

11        A.    Well --

12        Q.    -- what do you mean by that?

13        A.    -- they were produced in this case.

14   I'm sorry.

15        Q.    You -- you did nothing more than

16   copy them from the -- from Aon's presentation,

17   correct?

18        A.    Correct.

19             MR. SHIFRIN:  Object to the

20        question, for the record.

21        Q.    (BY MS. HELLMANN)  In looking at

22   the chart on Page 7, this shows the spend

23   month by month under Optum and the

24   month-by-month spend under Express Scripts,

25   correct?

113

1      A.   Yes.

2      Q.   Do you have an opinion as to

3  whether the reason for the increase in spend

4  is because Express Scripts was the PBM and not

5  Optum?

6      A.   Could you ask that again, please?

7      Q.   Do you have an opinion as to

8  whether the reason for the increase in spend

9  was because Express Scripts was the PBM and

10  not Optum?

11        MR. SHIFRIN:  Objection to form.

12        THE WITNESS:  Yeah, I -- I'm

13      struggling with that question, only

14      because that's really the whole -- the

15      whole point of the case, really.

16      I mean --

17      Q.   (BY MS. HELLMANN)  Well, let me ask

18  you this:  Is it your opinion that New York

19  City Transit's compound spend would not have

20  increased if Optum remained the PBM?

21      A.   I have no idea.  I did not look at

22  Optum's programs or network.  That was outside

23  the scope of what I was asked to do.

24      Q.   Did you compare the number of plan

25  members when Optum was the PBM versus the

114

1    number of plan members when Express Scripts

2    was the PBM?

3         A.   No.

4         Q.   Did you compare New York City

5    Transit's benefit coverage under Optum to see

6    if there were any differences between the

7    benefit coverage under Optum and the benefit

8    coverage under Express Scripts?

9         A.   No.

10        Q.   Did you review Transit's contract

11   with Optum to see if there were any

12   differences between that and the contract with

13   Express Scripts?

14        A.   No.

15        Q.   You indicate on Page 6, immediately

16   before the first chart -- you state, "The

17   spike was immediate upon ESI's assumption of

18   PBM responsibilities, as compounds doubled in

19   the first month of the contract with..." --

20   Express Scripts.

21             Do you see that?

22        A.   Yes.

23        Q.   If Express Scripts didn't know what

24   the spend was under Optum, fair that it

25   wouldn't have visibility into whether the

123

1   report.

2            And I'm looking at your Paragraph 5

3   on the page before it, which refers to this

4   chart.

5            You say, "As the chart below

6   demonstrates, the compound spike involved a

7   disproportionate volume of ten specific

8   compounds..."

9            Do you see that statement that you

10  make?

11       A.   Yes.

12       Q.   And is it your testimony that each

13  of these PBM drug names are specific

14  compounds?

15       A.   They're ingredients that go into a

16  compound.  I don't think compounds really have

17  names.

18       Q.   In the data that you received --

19  you did receive some claims data, the raw data

20  in this case.

21            Could you go to that data and look

22  to see where these PBM drug names are

23  identified?

24       A.   I would have to go back to the data

25  and see.

124

1        Q.    Do you know if the PBM drug name is

2   identified anywhere in that -- in the data

3   that you've received?

4        A.    I would have to go back to the data

5   and check.

6        Q.    If I wanted to go look at data to

7   verify that these numbers are accurate, where

8   would I go look?

9        A.    In the claims data.

10        Q.    And that's the claims data that you

11   have, correct?

12        A.    Yeah.

13             I -- what you're asking me is if

14   the name of this particular drug was in the

15   data.

16             And I'm saying, I would to have go

17   back.  There were, I believe, over a hundred

18   fields of data that -- that we got.

19             So I would have to go back and look

20   at see if this specific drug name was in the

21   data.

22             That's what you asked me and that's

23   what I'm -- I'm saying.

24        Q.    Right.

25        A.    So forgive me if I didn't memorize

125

1   all 200 of the data fields and what was in

2   there or not.

3        Q.   My question -- that wasn't my

4   question.

5             My question is -- I said:  If I

6   wanted to go verify that the numbers in these

7   charts are accurate, where would I look?

8             And you testified that I would look

9   in the claims data, correct?

10       A.   Yes.

11       Q.   And then prior to including these

12  charts in your report, you didn't verify any

13  of the numbers, correct?

14       A.   No.

15       Q.   The compound drug ingredients that

16  are identified on this chart as PBM drug

17  names, New York City Transit covered all of

18  these ingredients as part of its benefit

19  design, correct?

20       A.   They covered compounds.

21       Q.   And so, therefore, covered these

22  ingredients, correct?

23       A.   Yes.

24       Q.   Do you have an opinion as to

25  whether the top ten ingredients would have

127

1          A.    Yes.

2          Q.    And that you took it from the

3     presentation and copied it into your report,

4     correct?

5          A.    Yes.

6          Q.    The members that are shown under

7     "Express Scripts," do you know -- or did you

8     look to see if any of these members were New

9     York City Transit members prior to April

10    of 2016?

11         A.    No.

12         Q.    I guess -- and since you didn't

13    review and you don't even have the Optum data,

14    you have no way of knowing, correct?

15         A.    Correct.

16         Q.    Member No. 1 under Optum, it looks

17    like he or she had 37 prescriptions.

18               Do you see that?

19         A.    Yes.

20         Q.    Over what period of time did that

21    Member 1 get those 37 prescriptions?

22         A.    I would have to look back at the

23    time period.

24         Q.    Well, go ahead and look back.

25         A.    Well, I guess I would have to bring

128

up that other document, the one that had the

charts in them.

            Do you -- do you want me to take a

break and go do that?

      Q.   Yeah.  It's in the next tab -- or

it's Exhibit 119, if you want to pull it up.

      A.   Okay.  Hold on.

            (Witness reviewing exhibit.)

            Well, it looks like the Optum time

period was from April '15 to March 30th, 2016;

and then the ESI timeframe was April '16

through December '17.

      Q.   They're different time periods,

correct?

      A.   Well, of course.  Because it was

when Optum was the PBM and when ESI was the

PBM, yes.

      Q.   The Optum data looked in the period

of 12 months, correct?

      A.   Yes.

      Q.   Express Scripts' data was looking

at a period of 20-some months?

      A.   Yes.  Roughly 20 months, yes.

      Q.   And with respect to Member 1 under

Optum, do you know if those 37 prescriptions

1    Scripts received his or her 65 prescriptions

2    over a period of 20 months, would that have

3    been relevant to your analysis?

4         A.    No.

5              As I say here, none of the

6    beneficiaries in the top ten for compounds

7    under ESI were also in the top 10 or 20 for

8    Optum.

9              All I'm pointing out in here is

10   that these were different numbers under Optum

11   as ESI.  That -- that was really all the point

12   of this chart was.

13        Q.    And fair, though, you don't know if

14   any of the members under Optum were still

15   members when Express Scripts became the PBM.

16             True?

17        A.    You're right.  I don't know.

18             But it would be really unlikely

19   that a bunch of members would just drop off

20   from one month to the next.

21        Q.    But you have no way of knowing

22   that, correct?

23        A.    I don't.  And --

24             (Simultaneous speaking.)

25        Q.    You could have confirmed it by

1    looking at the underlying claims data, but you

2    didn't, correct?

3         A.   I didn't have the -- Optum's claims

4    data.

5         Q.   Did you ask for the -- Optum's

6    claims data?

7         A.   It wasn't relevant to me.

8         Q.   And, conversely, the -- the members

9    under -- the top ten members under Express

10   Scripts, you have no way of knowing if they

11   were members when Optum was a PBM, correct?

12        A.   Correct.

13        Q.   After Aon provided this chart to

14   New York City Transit in January of 2018, do

15   you know if Transit investigated any of these

16   numbers?

17        A.   I don't.

18        Q.   Do you know if Transit asked any of

19   their members why they were receiving compound

20   prescriptions?

21        A.   I think -- I think eventually

22   Express Scripts did, but I don't think Transit

23   did.  But I'm not sure.

24        Q.   Do you know if Transit passed on

25   the information about these ten members to the

1    MTA OIG's office?

2         A.    At some point there was a fraud tip

3    that was passed on, yes.

4         Q.    Do you know in January or February

5    of 2018, if the information on this chart was

6    passed on to the OIG's office?

7         A.    I don't.

8         Q.    Do you know if Express Scripts sent

9    member verification letters to any of the

10   members that are identified on this chart?

11        A.    I don't.

12        Q.    I guess it would be impossible for

13   you to know because you don't know the

14   identity of these members.

15             Is that correct?

16        A.    Correct.

17        Q.    The underlying claims data would

18   have it, though, correct?

19        A.    Yes.

20        Q.    Would it surprise you to know that

21   Express Scripts did send letters to some of

22   the individuals on this chart, asking them to

23   verify that they received the prescriptions?

24        A.    I -- I do recall that ESI did send

25   letters out to members.  I don't know if they

1    are the members on this chart because I did

2    not memorize the numbers of the -- of the

3    members.

4         Q.   And you don't know the names of the

5    members, correct?

6         A.   I don't know the names of the

7    members, either.

8         Q.   Because you didn't review the

9    underlying claims data that made up this

10   chart, correct?

11        A.   Correct.

12             MR. SHIFRIN:  Sarah, asked and

13        answered several times now.  I've given

14        you some latitude, but I think you can

15        move on.

16             MS. HELLMANN:  We're going to do

17        this for each chart, Max.

18        Q.   (BY MS. HELLMANN)  Sitting --

19             (Simultaneous speaking.)

20             MR. SHIFRIN:  How many --

21        Q.   (BY MS. HELLMANN)  -- here today --

22             MR. SHIFRIN:  -- times for each

23        chart?

24        Q.   (BY MS. HELLMANN)  Sitting here

25   today, Ms. Hayes, are you able to testify that

1    chart -- show me what's shown -- what's

2    depicted in the chart on Page 10.

3         A.    These are pharmacies, and what was

4    dispensed in each of these pharmacies.

5         Q.    And what period of time is this?

6         A.    Since it's from the same Aon

7    presentation that we've been discussing, I

8    assume it's the same period of time.

9         Q.    Which is what?

10        A.    Well, let's go back and read it.

11              Optum was April 2015 to March 30th,

12   2016; and ESI was April 2016 to December 2017.

13        Q.    Now, here, Fusion Specialty

14   Pharmacy is identified as the Number One

15   pharmacy under Express Scripts, correct?

16        A.    Yes.

17        Q.    And earlier you stated that you

18   believe that Express Scripts acted

19   inconsistent with the industry standard and

20   what a reasonable and prudent PBM would do

21   with respect to notifying New York City

22   Transit about Fusion, correct?

23        A.    Yes.

24        Q.    And I believe your testimony was

25   that Express Scripts should have notified New

136

1   York City Transit in April, May or June

2   of 2016, correct?

3           A.   Yes.

4           Q.   How much did Fusion Specialty --

5   what was the volume of prescriptions dispensed

6   by Fusion Specialty Pharmacy in April of 2016?

7           A.   I would have to go back and look.

8   I don't know.

9           Q.   Where would you go look?

10          A.   I would go look in the claims data.

11          Q.   You haven't looked yet, correct?

12          A.   No.   Because that wasn't what I was

13  asked to do.

14          Q.   How much did Fusion Specialty

15  Pharmacy dispense in May of 2016?

16          A.   I -- I don't know.

17               I do know that there was a spike in

18  utilization and I do know that Fusion

19  contributed to that spike.

20          Q.   How much did Fusion contribute to

21  the spike in utilization in April of 2016?

22          A.   I don't know.

23          Q.   How much did Fusion contribute to

24  the spike in May of 2016?

25          A.   I don't know.

137

1              And that's really not the point, in

2    my mind.

3         Q.   What is your --

4              (Simultaneous speaking.)

5         A.   -- (inaudible) --

6         Q.   -- basis -- (communications

7    breakup/inaudible) -- that Express Scripts

8    should have brought Fusion Pharmacy to New

9    York City Transit's attention in April, May or

10   June of 2016, when you don't know how much

11   Fusion Pharmacy dispensed in any of those

12   months?

13        A.   My opinion -- and my Opinion Number

14   One is that early on in the relationship there

15   was a spike in utilization of compounds.

16              That was reported in a report from

17   ESI to New York.

18              But there should have been a

19   further breakdown in exactly the questions

20   you're asking:

21              What was the nature of these

22   compounds?

23              Who were the pharmacies?

24              Who were the prescribers?

25              Who were the patients?

138

1            Were these drugs medically

2    necessary?

3            The questions you're asking should

4    have been asked by ESI early on in the

5    relationship so that they could have empowered

6    New York City Transit and -- and themselves to

7    do something about it.  That's my point.

8            So how much Fusion was is exactly

9    the point I'm making.

10       Q.   You -- earlier you said that

11   Express Scripts, to act consistent with the

12   industry standards, should have brought Fusion

13   to New York City Transit's attention in April,

14   May or June of 2016.

15           I am asking you:  What is the basis

16   for that opinion?

17       A.   My basis for that opinion is that

18   when you see compound drugs as your number one

19   spend, which is what the reports from ESI

20   stated, there should have been additional

21   drill-down into what was causing compound

22   drugs to be the number one drug.

23           What were the pharmacies?

24           What were the patients?

25           What were the drugs?

139

1              Were they medically necessary?

2              All of the questions that you're

3    asking should have been asked by ESI, by

4    drilling down into their own claims data and

5    presenting that information to New York

6    Transit Authority so that they and ESI

7    together could do something about this spike

8    in compounds.

9         Q.   And I'm talking about --

10   (communications breakup/inaudible).

11             You have no idea how much Fusion

12   dispensed in April, May or June of 2016; is

13   that correct?

14             MR. SHIFRIN:  Objection.  Asked and

15        answered, by my count four times.

16             But go ahead.  One more time.

17             THE WITNESS:  I do not know.

18             MS. HELLMANN:  Thank you.

19        Q.   (BY MS. HELLMANN)  Do you know how

20   much Fusion Pharmacy dispensed the two months

21   immediately before it was blocked?

22        A.   I did see a report showing that.  I

23   don't know remember exactly how much it was.

24             It was a lot.

25        Q.   This is my only chance to ask you

142

```
 1                And that's about Fusion Pharmacy,
 2    correct?
 3         A.   No.  Fusion Pharmacy and any other
 4    pharmacy that was causing problems related to
 5    compounds.
 6         Q.   What were the pharmacies that were
 7    causing problems related to compounds?
 8         A.   Well, it seemed like there was
 9    additional compound -- additional pharmacies.
10    I don't know if they were submitting claims in
11    April, May or June.  I do know that Fusion
12    Pharmacy was.
13         Q.   Do you know how many claims Fusion
14    Pharmacy submitted in April of 2016?
15              MR. SHIFRIN:  Objection.  Asked and
16         answered multiple times already, Sarah.
17         Q.   (BY MS. HELLMANN)  You don't know,
18    do you, Ms. Hayes?
19         A.   No, I don't.
20         Q.   Is there -- let me ask you this:
21    Is there some industry standard whereby a PBM
22    needs to report a spike in pharmacy dispenses
23    to a client?
24         A.   No, there's no industry standard.
25              There's no regulation that they're
```

143

1    required to do so.

2         Q.   Is there some dollar amount that

3    should trigger a PBM telling a client about a

4    pharmacy?

5         A.   No.  There is no specific trigger.

6    You know it when you see it.  When you see

7    compound drugs over a million dollars a month,

8    that is a trigger, yes.

9              Now, is it written down in stone

10   somewhere?

11             No.

12             But as I pointed out, it -- and as

13   anyone in the industry would know, compounds

14   are a rare thing, less than one percent of

15   utilization.

16             And when you see a million dollars

17   being spent in compounds, yes, that is

18   something that you should immediately tell

19   your client about and work with them to remedy

20   that.  Yes.

21        Q.   And did Express Scripts --

22   (communications breakup) --

23             Did Express Scripts immediately

24   tell New York City Transit in April, May or

25   June of 2016 about its compound spend?

144

1        A.   It reported the compounds -- it

2   reported the dollar amount of compounds and

3   that compounds -- compounds was the number one

4   drug.  Yes, it did that.

5             But it should have taken a step

6   further.  The account management team should

7   have taken a step further and said, "What are

8   we going to do about it?  Here's our

9   suggestions."

10        Q.   And what is your basis that the

11  account team did not take such steps?

12        A.   My basis is that even into 2017,

13  compounds were still millions of dollars a

14  month.  So nothing seems to have happened

15  regarding compound utilizations.

16        Q.   Ms. Hayes, did you read any of the

17  depositions of any of the account management

18  people from Express Scripts?

19        A.   No.  Nor was it relevant to my

20  opinion.

21        Q.   You said -- you've talked about,

22  though, what the account team should have done

23  with respect to New York City Transit.

24             And -- fair that you have no idea

25  what the Express Scripts account team has

145

1    testified to in this case.

2            Correct?

3        A.   Correct.

4            And that's not relevant to my

5    opinion.  My opinion is that millions of

6    dollars continued to be spent on compounds.

7        Q.   And tell me -- I want to back up

8    for a second.

9            And is it -- if I hear your -- your

10   testimony, though, you believe Express Scripts

11   should have raised the spike in compound spend

12   to New York City Transit in April, May or

13   June -- which you acknowledge that they did,

14   correct?

15       A.   They --

16           (Simultaneous speaking.)

17           MR. SHIFRIN:  Objection.

18           THE WITNESS:  -- they acknowledged

19       that compound drugs were the number one

20       drug being spent.

21       Q.   (BY MS. HELLMANN)  And you have no

22   idea, sitting here today, what one, two,

23   three, five pharmacies made up that increase;

24   is that correct?

25       A.   Yeah.

146

1              I've answered that many times now.

2    Yes.

3         Q.   You don't know.

4              And you also did not review any of

5    the testimony of the account team or anyone

6    from New York City Transit in terms of any of

7    the discussions on this issue.

8              Is that fair?

9         A.   That is fair.

10        Q.   And so is the basis of your opinion

11   that Express Scripts didn't do what you

12   believe the industry standard required it do

13   because the compound spend increased?

14        A.   Yes.  That is my opinion.  Those

15   are the facts in the matter, that compounds

16   continued to -- continued to run, you know, in

17   the millions of dollars a month for a period

18   through '16 and into '17.

19        Q.   And is there any other basis for

20   your opinion that Express Scripts did not

21   appropriately respond to New York City

22   Transit's compound spend, other than the fact

23   that the compound spend increased thereafter,

24   month over month?

25             MR. SHIFRIN:  Objection.  Asked and

147

1          answered and mischaracterizes prior

2          testimony.

3               MS. HELLMANN:  Go ahead, Ms. Hayes.

4               THE WITNESS:  Can you repeat the

5          question, please?

6               MS. HELLMANN:  Sure.

7          Q.  (BY MS. HELLMANN)  Is there any

8   other basis for your opinion that Express

9   Scripts failed to meet an industry standard

10  regarding New York City Transit's compound

11  spend other than the fact that the compound

12  spend increased in 2016 and into 2017?

13              MR. SHIFRIN:  Same objection.

14              THE WITNESS:  Well, I've answered

15         that, but you -- let's break down the

16         question.

17              Can we do that?

18              So let's take the first part of the

19         question.

20              MS. HELLMANN:  Okay.

21              Do you want to answer the first

22         part of the question?

23              THE WITNESS:  Why don't you ask me

24         just the first part of the question?

25              MS. HELLMANN:  Could you read the

148

1    question back, please, Teri?

2         THE REPORTER:  Yes.

3         (The record was read.)

4         THE WITNESS:  Okay.

5         So the first part of the question

6    was:  based on an industry standard...

7         And I've testified that there is no

8    set-in-stone industry standard other

9    than you kind of know it when you see

10   it.

11        And account management has one of

12   the three big preeminent PBMs in the

13   industry.

14        You know when compounds are more

15   than a million dollars a month, that's

16   something that needs to be brought to

17   your attention.

18        And my opinion that nothing was

19   done, that was effectively done, is

20   evident from the fact that millions of

21   dollars continued to be spent every

22   month on compounds.

23        So that's how I break down that

24   question.

25   Q.   (BY MS. HELLMANN)  Do you have an

151

1              New York City Transit spent

2    $1.3 million on compounds in April of 2016.

3         A.   Right.

4         Q.   How much did New York City Transit

5    spend on non-compounds?

6         A.   I don't know.

7         Q.   So you have no idea what percent of

8    New York City Transit's compound spend -- I'm

9    sorry -- prescription drug spend was

10   compounds.

11        A.   No.

12             I did see something on their total

13   spend, but I don't remember what it was.

14             And it's irrelevant -- irrelevant

15   to my opinion.  A million dollars is a lot of

16   money for compounds.

17             Remember, compounds are supposed to

18   be for patients who cannot take commercially

19   available products.  That is a significant

20   amount of spend of medication that is not

21   commercially available.

22        Q.   Ms. Hayes, you mentioned earlier

23   and you've mentioned a couple times about this

24   one to three percent.

25             Do you know if New York City

1    Transit's compound prescription drug was

2    higher than one to three percent of their

3    total prescription drug spend?

4         A.   I would have to look back in my --

5    in -- in the documents that were sent to me.

6    I do believe I did get a total.  I don't

7    remember what it is.

8         Q.   And you didn't -- (communications

9    breakup) -- you didn't include that total in

10   your report, correct?

11        A.   No, I did not.

12        Q.   You didn't review the claims data

13   to come up with that total, correct?

14        A.   Correct.

15        Q.   And, sitting here today in your

16   deposition, you have no idea what percent of

17   New York City Transit's total compound

18   prescription -- I'm sorry -- total

19   prescription drug spend was compound drugs.

20        MR. SHIFRIN:  Objection.  Asked and

21        answered many times.

22        Q.   (BY MS. HELLMANN)  Correct?

23        A.   Correct.

24        Nor was it relevant -- relevant to

25   my opinion.

153

1          Q.   Well, Ms. Hayes, why do you keep

2    talking about the one to three percent as

3    being -- I think you mentioned it like an

4    industry benchmark.

5               Is that relevant to you, that one

6    to three percent number?

7          A.   Yes.

8          Q.   Okay.

9               So if that's relevant to you, why

10   is what New York City Transit actually spent

11   not relevant to you?

12         A.   It -- it was relevant.  It wasn't

13   relevant -- I -- I don't honestly remember.  I

14   remember seeing it.  I didn't put it in my

15   report and I don't remember it sitting here

16   today.

17              If you want to pull up documents,

18   we can -- we can start pulling up documents

19   and see what it was.

20         Q.   I'm just asking you what you know

21   today and based on what you've put in your

22   report.

23         A.   And it was significant, and that's

24   what I put in my report.

25         Q.   Looking back at your chart on

1  utilization of compound drugs, said, "These

2  are the pharmacies that are submitting them

3  and these are the prescribers.  Here's where

4  they are geographically.  You have a problem,

5  New York City Transit.  Let's do something

6  about it.  Let's manage it."

7          That's what ESI should have done.

8  They should have done that early and often.

9      Q.   And tell me what -- (communications

10  breakup) -- what is the basis for your opinion

11  that Express Scripts should have broken down

12  the spend by pharmacies, prescribers and

13  geographic area.

14      A.   My opinion is based on 25 years of

15  doing this, sitting in hundreds of meetings

16  where PBMs have gone over utilization, and

17  where there is a large category of spend where

18  the PBM offers solutions to manage that spend,

19  whether it's compounds or diabetic medications

20  or rheumatoid arthritis medications or

21  specialty drugs or what have you.  That is

22  their job as a PBM.

23      Q.   You didn't sit in any meetings with

24  New York City Transit and Express Scripts,

25  true?

159

1      A.   I was -- I was retained two and a

2  half months ago.  Of course not.

3      Q.   And you didn't read any of the

4  depositions of the people that would have been

5  at those meetings, correct?

6      A.   Correct.

7      Q.   Fair that you don't know what was

8  discussed at these meetings between Express

9  Scripts and New York City Transit.

10      A.   No.  I'm looking at the results.

11  The results are spend continued and it was not

12  managed well.

13      Q.   And earlier you -- you mentioned

14  the solutions that should have been offered.

15  And I think we've gone through those.

16           And I think the one that you

17  believe should have been offered was

18  terminating or eliminating the pharmacy from

19  the network, correct?

20      A.   Yes.

21           And certainly from New York's

22  network, if there was a special network just

23  for New York City Transit Authority.

24      Q.   And you don't know one way or the

25  other whether New York City Transit had a

160

1    special network.

2           A.   I don't think they did have a

3    special network.

4                But, again, they could have just

5    eliminated it for that one client or -- you

6    know, it's outside the scope of what I was

7    asked to do, to see if they should have

8    eliminated it for their other clients.

9           Q.   Are there any other solutions that

10   you're -- that you believe Express Scripts

11   should have offered?

12          A.   I think the most expedient solution

13   would have been to have eliminated this

14   pharmacy from the network.

15          Q.   When was Fusion Pharmacy

16   eliminated?

17          A.   I think they were eventually

18   eliminated at the end of 2017.

19          Q.   Do you have an opinion as to when

20   they should have been -- or when Express

21   Scripts should have eliminated them?

22          A.   Early on in the relationship, as I

23   said.  The first quarter, at least.

24          Q.   The first quarter of 2016?

25          A.   Yes.  I mean, not the first quarter

1  of the year of 2016, but the first quarter

2  that they were under ESI's management -- New

3  York City was under ESI's management, which

4  would have, I guess, been the second quarter

5  of 2017.

6        Q.   That would have been April, May or

7  June.

8        A.   Yes.  Yes.  Of 2016.  Sorry.

9        Q.   And in coming up with that opinion,

10  would it have been helpful for you to review

11  the Fusion Pharmacy claims data?

12        A.   No, not necessarily.

13        Q.   Would it have been helpful to know

14  if, in April, the spend at Fusion Pharmacy was

15  $30,000?

16             Would that have been relevant to

17  your opinion?

18        A.   No.

19        Q.   And tell -- and tell me, I guess,

20  if you're saying that Express Scripts should

21  have raised Fusion Pharmacy, why would the

22  spend at Fusion Pharmacy not be relevant?

23        A.   Because ESI knew what -- even at

24  $30,000, you know -- what was the spend for

25  $30,000' worth of compounds?

162

1            That even seems crazy.

2            It seems crazy that you've got a

3    Utah pharmacy for a bunch of New York

4    employees.  That seems crazy.

5            Even at $30,000, that seems like,

6    you know, kind of a lot of money.

7        Q.   So what is the amount of money that

8    should have been raised -- the amount of money

9    that Express Scripts needed to see spend at

10   Fusion Pharmacy to raise it with New York City

11   Transit?

12       A.   I -- I can't tell you that.

13           I can tell you that certainly

14   $30,000 -- even $30,000 should have raised

15   suspicion.

16           When you have a group of employees

17   that are all in New York that are now using a

18   Utah pharmacy -- how did they -- how did those

19   employees even know to send this to a Utah

20   pharmacy?

21           Why would they have done that?

22           Those would have raised a lot of

23   red flags to me, even $30,000' worth of

24   claims.

25       Q.   But you have no opinion as to was

163

1    that spend number would be?

2         A.   No.

3              Remember, compounds are very rare.

4    They should be very rare.  It's when a

5    commercially available product does not suit

6    that patient's needs, that individual

7    patient's needs.

8              And so it just seems like even

9    $30,000 is a lot of money.

10             How many patients could there have

11   been that had some need that isn't satisfied

12   by a very robust pharmaceutical industry?

13        Q.   Looking at the chart on Page 10, it

14   looks like the -- the total of these ten

15   pharmacies is $67 million and change.

16             Do you see that?

17        A.   Yes.

18        Q.   Do you have an opinion as to

19   whether any of the $67 million in compound

20   claims reflected on this charge (sic) were

21   fraudulent?

22        A.   No.

23        Q.   And let's go to the chart on

24   Page 11.

25             You talk about Dr. Cohen and you

179

1          A.   I'm not sure I said "big" claims.

2     I said -- if I did, my apologies.

3               Express Scripts should have looked

4     at the compound claims and reported what the

5     breakdown of those compound claims were.

6               Exactly as -- as Aon did later on,

7     ESI should have done early on and said, "Here

8     are the drugs.  Here's the physicians.  Here's

9     the pharmacies.  We think there's a problem.

10    Let's try and fix it."

11              Not just reported the two high-cost

12    claims over $15,000.  There were claims under

13    $15,000.

14              I mean, as we see here on Page 8 of

15    my report, "Cost per script," there are many

16    claims that were 3,000, 900, 9,000, 6,000, you

17    know, 2,000, 1,000.  There were many claims

18    under $15,000 that contributed to this

19    $67 million' worth of compounds.

20              And my basis for that opinion is

21    25 years in this business of sitting with

22    clients every quarter and going through what

23    their utilization is and having PBMs report

24    the utilization.

25              And, again, whether it's compounds

180

1   or diabetic medication or things like

2   cholesterol medication, what is the problem

3   with our membership and how do we go about

4   managing that?

5            That is the role of a PBM.

6       Q.   And sitting in these meetings with

7   the clients and other PBMs -- I understand you

8   haven't been in one with Express Scripts,

9   correct?

10      A.   Not lately, no.

11      Q.   When is the last time you sat with

12  a client at Express Scripts in one of these

13  meetings?

14      A.   Oh, it's got to have been maybe

15  five years or more.

16      Q.   And in sitting with clients and the

17  PBMs in these -- in these meetings, what --

18  what do the contracts between the client and

19  the PBM say about reporting and the reports

20  that will be provided?

21           MR. SHIFRIN:  Object to form.

22           THE WITNESS:  I'm sorry.

23           Did you say something, Mr. Shifrin?

24           MR. SHIFRIN:  I just objected to

25       form.

181

1              You can answer.

2              THE WITNESS:  Okay.

3              Well, it's -- it's outside the

4         scope of what I've been asked to do,

5         but -- but in these meetings, you're

6         asking me what the contracts actually

7         say.

8              Some of the contracts are very

9         specific with clients as to what is

10        going to be reviewed that, you know --

11        be provided as a report package and

12        what's going to be reviewed.  Other

13        contracts are less detailed.

14             But in almost all the situations

15        there is a clause in there that there

16        will be an account management team.

17        That account management team will bring,

18        you know, utilization trends to the --

19        to the client and work on those trends,

20        you know, in a -- in a way to better

21        manage the plan.

22        Q.   (BY MS. HELLMANN)  What do the

23   contract requirements for New York City

24   Transit say on that issue?

25             MR. SHIFRIN:  Object to form.

182

```
1              THE WITNESS:  Well, as I say in my
2         report:  "Section 4.2" -- says that --
3         "...provide customer service in a
4         prudent and expert manner, including
5         investigations and reviewing..." --
6         "...claims..."
7              And then "Section 4.1" says a
8         "...degree of care and reasonable
9         diligence that an experienced and
10        prudent plan administrator..." --
11        "...under" -- the -- "...group health
12        plan familiar with such matters
13        would..." -- act.
14             And so that's where I'm saying that
15        they had a responsibility to bring these
16        issues to New York City Transit's
17        attention.
18        Q.   (BY MS. HELLMANN)  Are you aware of
19   any -- (communications breakup/inaudible) --
20   sorry.
21             Are you aware of any provision in
22   the contract between -- (communications
23   breakup/inaudible) --
24             THE REPORTER:  Okay.  Try again.
25        Q.   (BY MS. HELLMANN)  Are you aware of
```

183

1    any provision in the contract between Express

2    Scripts and New York City Transit that talks

3    about the reports that Express Scripts would

4    provide?

5         A.   I believe there was something in

6    there, but I would to have look at the

7    contract.  We can bring that up as an exhibit.

8              MS. HELLMANN:  Beth, let's bring up

9         the contract, please.

10             MS. BOZICEVIC:  The document that's

11        previously been marked as ESI Exhibit 7

12        has been added to the chat.

13             (Exhibit No. 7 Previously Marked.)

14        Q.   (BY MS. HELLMANN)  Do you have that

15   document in front of you, Ms. Hayes?

16        A.   I've downloaded it and I'm trying

17   to open it.  Hold on.  Let's see.

18             I've got so many documents open

19   now.  I'm trying to find Seven.

20             I've got to start closing some of

21   these, because I think that --

22             (Pause.)

23             I'm going to start closing some of

24   these documents -- earlier documents, if

25   that's okay with you.

187

```
1        Q.   And so --

2        A.   I think with -- I tried to, in the

3   last five minutes, go through a 355-page

4   document as well as I can, to show you what I

5   think, that it was a requirement that they

6   meet, review reports and -- and be

7   consultative in nature and review what's going

8   on with the account.

9             MR. SHIFRIN:  I would like to note,

10            Sarah, that the witness is not here, nor

11            has she been retained, to, strictly

12            speaking, interpret contracts.

13            She was retained to interpret a

14            specific industry standard clause that

15            appears in a contract, and the rest of

16            this is all legal analysis that is not

17            within the scope of Mrs. Hayes'

18            retention.

19            But, by all means, go ahead.

20            MS. HELLMANN:  I 100 percent agree

21            with you, she is not qualified to talk

22            about legal conclusions, Max.  I think

23            that's actually one thing we are going

24            to completely agree on today.

25       Q.   (BY MS. HELLMANN)  Ms. Hayes, in
```

188

1    your review of the contract did you review the

2    exhibit that talked about what reports would

3    be provided to Transit?

4         A.   Well, we could -- can you direct me

5    to where that is?

6         Q.   110.

7         A.   110 of 1- -- of 355?

8         Q.   Yes.

9         A.   Yes.  There is a sample report

10   package.  Yes.

11        Q.   Did you review that sample report

12   package to -- well, let me start there.

13             Did you review the sample report

14   package?

15        A.   Yes.

16        Q.   Okay.

17             Did you see if there were any

18   reports in there that were not provided to

19   Transit?

20        A.   No, I don't believe there were.

21        Q.   Okay.

22             You can put aside the contract,

23   ma'am.

24        A.   Okay.

25        Q.   Going back to your report, on

NYCTA vs                                                   Susan Hayes
Express Scripts                                        February 19, 2021

1   Page 11 -- when you were talking about the red

2   flags that you saw in the charts that Aon

3   prepared in February of 2018 and you talked

4   about the members that are reflected on

5   Page 9 -- the chart in Page 9 -- and -- do you

6   know and do you have an opinion if --

7          MS. HELLMANN:  Well, strike that.

8       Q.   (BY MS. HELLMANN)  You would agree

9   that as part of the base Fraud, Waste and

10  Abuse Services, Express Scripts wasn't looking

11  at particular members, correct?

12      A.   The focus was not -- in the base

13  product the focus was not members.  That is

14  not to say that they should not have been

15  looking at members within a broader scope.

16      Q.   And what's the basis --

17  (communications breakup/inaudible) --

18          THE REPORTER:  Can you repeat --

19      Q.   (BY MS. HELLMANN)  --

20  (communications breakup/inaudible) -- despite

21  not being in the Enhanced Fraud, Waste & Abuse

22  Program?

23          THE REPORTER:  I didn't hear the

24      beginning of your question.

25      Q.   (BY MS. HELLMANN)  What is the

190

1   basis for your opinion that Express Scripts

2   should have been looking at members as part of

3   the base fraud monitoring?

4        A.   As I just testified, the focus in

5   the base program was not specifically members,

6   was a member committing fraud.

7             But in the base program they should

8   have been looking at members from the

9   viewpoint -- I mean, let's say an absurd

10  example.

11            What if one member submitted 40,000

12  claims?

13            Well, I think they should have

14  looked at that member, and was that member --

15  like some member would have 40,000

16  prescriptions in a day, a week, a month,

17  whatever.

18            And it's an absurd example.

19            But I'm saying, as their overall

20  Fraud, Waste & Abuse Program, yes, they should

21  have been looking at members from a metric

22  point of view --

23            (Simultaneous speaking.)

24        Q.   -- (inaudible) --

25        A.   -- (inaudible) -- in evaluating if

191

1   there's something else that needs to be

2   investigated.

3          Q.   And I -- and I -- (communications

4   breakup/inaudible) -- that.

5               My question is:  What is the basis

6   for that opinion?

7          A.   Well, early on this morning we

8   brought up a description from ESI of what

9   their basic fraud program was, and it seemed

10  like that that was something -- we could bring

11  it up again -- but as I recall from this

12  morning it seems like that was a basic, you

13  know, metric that they would be looking at,

14  broadly.

15              MS. HELLMANN:  Yeah.  Let's bring

16         it up again.

17              Beth, you might have to go back in

18         the chat.

19              MS. BOZICEVIC:  I added back to the

20         chat the document we previously marked

21         as ESI Exhibit 117.

22         Q.   (BY MS. HELLMANN)  Ms. Hayes, why

23  don't you take a look at that and let me know

24  where -- what you're alluding to.

25              A.   Well, there's certainly -- on the

197

1   drilled down.

2           Am I asking that they provide a

3   report specifically out of the Fraud, Waste &

4   Abuse Unit that drilled down into top members?

5           No.  That is a mischaracterization

6   of my testimony.  That is not what I said.

7       Q.  Okay.

8           So we can agree that none of the

9   reports that are listed on Page 4 and 5 of

10  this document, Express Scripts had a duty or

11  an obligation to provide Transit.

12          MR. SHIFRIN:  Object to form.

13          THE WITNESS:  Well, they -- they

14      didn't have a duty because New York

15      didn't purchase the Enhanced Fraud,

16      Waste & Abuse Program.

17          These reports, per se, they did not

18      have an obligation and a duty to provide

19      in this format.

20          They did have an obligation, in my

21      mind, to take the top category,

22      especially since it was so abnormal for

23      a category like compounds, and drill

24      down and provided some additional

25      information into who, what, why, how,

198

1          where?

2               Like:  What's going on with

3          compounds?

4               Again, just as if it was a diabetic

5          category or anticholesterol category,

6          they should have drilled down and said,

7          "Wow, this is a lot of utilization.

8          Let's look at it.  Let's see what the

9          problem is.  Let's try and rectify it."

10              So I'm not saying that they had an

11         obligation and duty to do the Enhanced

12         Fraud, Waste & Abuse Program, because

13         New York didn't purchase that.  But they

14         did have an obligation to manage the

15         Pharmacy Benefit.

16         Q.   (BY MS. HELLMANN)  And other

17    than -- (communications breakup) -- other than

18    your 25 years of experience in sitting in

19    these meetings, do you have any other basis

20    for that opinion?

21         A.   Other than what we've just reviewed

22    from in the contracts.

23         Q.   And then other than what you saw in

24    the contract, and that was the provision

25    regarding that they would provide quarterly

201

1  resulted in this balloon?

2      A.  Yeah.  So there was a change in the

3  Compounding Act due to several years before

4  there had been the New York -- I'm sorry --

5  the New England Compounding Center issue,

6  where a compounding facility had essentially

7  killed patients because the -- the sanitation

8  wasn't up to speed.

9          And so there were products that

10  were tainted that eventually killed patients

11  and -- so that kind of resulted in a moral

12  panic and legislation was passed to change

13  compounding facilities, to have additional

14  controls.

15          And, in addition, compounding

16  facilities could then -- also with this act

17  there was the ability where compound

18  facilities could solicit patients.

19          So that was also a change in the

20  Compounding Act.

21      Q.  Were you aware of the fact that in

22  2014, '15, a number of PBMs rolled out

23  exclusion programs that clients could use to

24  stop covering compounds?

25          A.  Yes, of course, including the

202

1   compound program that ESI had.

2         Q.   Would you expect that after those

3   programs were ruled out, the benchmark of

4   compounds would increase?

5         A.   Well, it's not what I expect.  It's

6   what happened.

7              So what happened was that, still in

8   '14, '15, '16, and even into '17, and even

9   today, we see compounders that are compounding

10  prescriptions that are commercially available,

11  for medication that's commercially available.

12        Q.   The study that you cite, what year

13  was the study?

14        A.   I don't think there was a date on

15  that study.

16             Let me go back and look at that.

17             Well, I pulled it up in May 2020.

18  So I don't know when -- when the study was.

19  So it's -- it's still on their web page as of,

20  you know, last year.

21        Q.   Do you know if the -- it was a

22  study that looked at the timeframe of the

23  Express Scripts-New York City Transit

24  contract, so 2016 to 2019?

25        A.   No, I -- I don't.

212

1  saying it is fraudulent.  It appears

2  consistent with fraudulent drug problems.

3       Q.   And with respect to the member in

4  Paragraph 18, tell me why that member's claims

5  show a, quote, pattern indicating fraudulent

6  claim submission.

7       A.   Well, I didn't say that in

8  Paragraph 18.  I just said:  Here's another

9  example of some similar -- the same behavior

10 exhibited where the member is going to CVS for

11 ibuprofen prescribed by a physician, and then,

12 almost a few days later, they're having a

13 prescription dispensed by Fusion Pharmacy,

14 prescribed by Honig.

15          So wouldn't -- you know, if you had

16 had a need for medication, wouldn't you have

17 talked to that prescriber that you got the

18 ibuprofen from?

19          That -- that's all I'm saying.

20          I'm not saying that it is

21 fraudulent.  I'm saying that it has a pattern

22 of what we see as fraudulent claims in the

23 industry.

24      Q.   And fair, that you have no idea

25 what that person spoke to his or her doctor

213

1   about?

2        A.   No.  I just looked at the claims

3   data.

4        Q.   And then tell me about the patient

5   that's set forth in Paragraph 19.

6             What's the relevance or import to

7   that?

8        A.   Well, again, it's the same kind of

9   pattern that we're seeing, where a member is

10  getting prescriptions filled by a Rite Aid for

11  amoxicillin by one physician, and then a few

12  days earlier they have these prescriptions

13  that are dispensed by Konig -- prescribed by

14  Konig and dispensed by Fusion.

15            Again, it's the same pattern that

16  you're seeing.  So you're seeing this

17  consistent pattern of members getting

18  prescriptions filled with a local physician

19  and a local pharmacy, and then all of the

20  sudden they're also getting them filled from

21  these physicians, that are all consistent with

22  other patients.

23            I mean, that just doesn't seem

24  like -- that doesn't seem normal to me.

25            Like, how would someone in a city

214

1  as big as New York, all of the sudden these

2  patients are seeing their -- kind of, like,

3  what I would say, normal physicians, and then

4  they're all going to this other Honig guy,

5  this Honig and Cohen and -- Honig physician

6  and going to this pharmacy in Salt Lake City.

7  It just doesn't -- or not Salt Lake City, but

8  in Utah.  It just doesn't make sense to me.

9          Like, how do these patients just

10  out of the blue all decide:  Oh, let's run to

11  this pharmacy -- this physician named Cohen

12  and get these prescriptions filled from a

13  pharmacy 3,000 miles away?

14          This is a red flag.

15          I'm not saying this is fraudulent.

16  I'm not saying I guarantee it's fraudulent --

17  although later we found out it was.  But at

18  this point in time this is a red flag.  This

19  is something that should have been brought up,

20  discussed, rectified, managed.

21      Q.   And in your mind, looking at the

22  claims data, is it common sense that this

23  might be a red flag?

24      A.   Yes.

25      Q.   You go on in Paragraph 20 -- and

215

1   I'm looking at, I guess it's the

2   second-to-the-last para- -- sentence in that

3   paragraph.

4              You said:  "This pattern should

5   raise the question of why ten members have all

6   decided to go to the same physician and need

7   the same compounded medications from a

8   pharmacy across the country."

9              And so the -- the analysis that you

10  just set forth in Paragraphs 17, 18 and 19,

11  was that the same for all ten members that are

12  identified in Exhibit C?

13       A.   Yes.

14       Q.   And you said they "...all decided

15  to go to the same physician..."

16              Now, the member in Paragraph 17

17  went to a Castano and the member in

18  Paragraph 18 went to a Honig and the member in

19  Paragraph 19 went to Konig (sic).

20              So who's the same physician that

21  all ten people went to?

22       A.   Well, there were overlaps --

23              (Simultaneous speaking.)

24       Q.   At least three physicians --

25       A.   At least three physicians, right.

216

1            But there were overlaps in the data

2    that I looked at.

3            Again, and it's the same pattern

4    of:  You're going to a local physician and a

5    local pharmacy for typical manufactured

6    products, medications, and then all of the

7    sudden now you're going to this -- these other

8    physicians for -- and this other pharmacy

9    halfway across the country -- or all the way

10   across the country.

11       Q.   You also say that these -- these

12   members received the same compounded

13   medication.

14            What's your basis that the

15   compounded medication was the same for all ten

16   of these members?

17       A.   Well -- okay.  You're interpreting

18   that sentence a little differently than the

19   way I wrote it.

20            I meant that it was all compounded

21   medications.

22       Q.   Okay.

23            So the data analysis that you did,

24   I could summarize it -- and tell me if I'm not

25   summarizing it correctly -- showed that ten

220

1    receiving this fraud tip?

2         A.   Well, I think I also said that they

3    should have investigated this situation.

4         Q.   What should they have done?

5         A.   Conducted investigations around

6    these pharmacies.  They had contractual

7    obligations to make sure that there were not

8    fraudulent pharmacies in their network.

9              And so when they got tip that

10   there's some fraud going on here, I think that

11   they should have investigated these.

12             And, in fact, I believe they did

13   reopen the investigation of Fusion Pharmacy.

14        Q.   And I -- just so we're clear, when

15   you say "these," you're referring just to

16   Fusion Pharmacy and REP Network, LLC?

17        A.   Yes.  Yes.  And I don't have any

18   belief that REP was in the network.

19        Q.   I'm sorry.  What was that, ma'am?

20        A.   I don't have any reason to believe

21   REP was in the network, but I don't know if

22   they were -- REP was working under -- like,

23   some pharmacies have, like, Joe's Pharmacy,

24   doing business as Mary's Pharmacy.  Although I

25   don't know that, so...

221

1          Q.   And I think you say that based upon

2    your review, Express Scripts did investigate

3    Fusion Pharmacy.

4          A.   I think that investigation was

5    reopened, yes.

6          Q.   You indicate on your report that,

7    in Paragraph 21:  "At the very least, once

8    Express Scripts received the fraud tip, it

9    should have pulled the prescription activity

10   for the implicated members itself.  Had it

11   done so, it would have noticed highly

12   irregular activity..." -- "...and could have

13   raised the issue with..." -- Transit.

14          Do you believe that Express Scripts

15   should have done this upon receiving the fraud

16   tip?

17          A.   Yes.

18          Q.   And so I just want to make sure

19   I'm, kind of, clear on everything you believe

20   Express Scripts should have done upon

21   receiving the fraud tip.

22          It should have looked at the

23   members -- or identified -- looked at the

24   prescription history of the members and it

25   should have investigated Fusion.

222

1              Is that correct?

2        A.   Yes.

3              MR. SHIFRIN:   Object to form, to

4        the extent that you're asking everything

5        that Express Scripts should have done.

6        That's beyond the scope.

7              But go ahead.

8        Q.   (BY MS. HELLMANN)  Well, do you

9   have an opinion as to whether Express Scripts

10  should have done anything else upon receiving

11  this fraud tip?

12       A.   As I testified, I think that

13  they -- Express Scripts should have pulled the

14  prescription utilization for these numbers,

15  looked at what was going on, opened the

16  investigation -- which I think that they

17  re-did -- and immediately terminated or

18  suspended -- and there is a difference --

19  Fusion's utilization in the network.

20       Q.   Have you reviewed the contract

21  between Express Scripts and Fusion Pharmacy?

22       A.   No, I haven't.

23       Q.   Do you know if there are provisions

24  in that contract regarding the suspension of

25  Fusion Pharmacy?

223

1        A.   No.

2        Q.   Do you know what the grounds for

3   termination of Fusion Pharmacy is per the

4   agreement between Express Scripts and Fusion?

5        A.   No.  I wasn't asked to do that.

6             MS. HELLMANN:  Beth, can we look at

7        Exhibit 71, please.

8             (Exhibit No. 71 Previously Marked.)

9             MS. BOZICEVIC:  The document

10        previously marked as ESI Exhibit 71 has

11        been added to the chat.

12        Q.   (BY MS. HELLMANN)  Ms. Hayes, I've

13   handed you what's been previously marked as

14   Exhibit 71.

15             And this wasn't on your list of

16   documents that you've reviewed so you might

17   want to take a minute and scroll through it.

18   And just let me know when you're ready.

19        A.   (Witness reviewing exhibit.)

20        Q.   Ms. Hayes, are you ready?

21        A.   Not quite.  I'm trying to figure

22   out --

23             (Simultaneous speaking.)

24        Q.   I don't want to hurry you.  I just

25   wasn't sure.

231

1          MS. BOZICEVIC:  The document we

2     previously called ESI Exhibit 117 has

3     been added back to the chat.

4          Q.  (BY MS. HELLMANN)  And, Ms. Hayes,

5   in looking at what's been marked as --

6   previously marked as Exhibit 117 -- and I'm

7   looking at the top of Page 2, which is an area

8   that you've referred to before.

9          In your review of the Fusion

10  investigation, did you see evidence where

11  Express Scripts requested -- I'm looking at

12  the first bullet point -- "prescriptions,

13  delivery records/signature logs" from Fusion?

14          A.  Yes.  I did.

15          Q.  As part of the Fusion

16  investigation, did Express Scripts send member

17  verification letters?

18          A.  Yes.

19          Q.  As part of the Fusion

20  investigation, did Express Scripts send

21  prescriber verification letters?

22          A.  Yes.

23          Q.  As part of the Fusion

24  investigation, did Express Scripts do a

25  purchase verification?

232

1          A.    I think they asked who the

2    wholesalers were that Fusion was -- was using.

3          Q.    What's the purpose of the purchase

4    verification?

5          A.    Well, if a pharmacy is dispensing a

6    bunch of drugs, you want to make sure they

7    bought a bunch of drugs.

8          Q.    What, in your opinion, did Express

9    Scripts -- or, actually, let me ask it even

10   broader.

11              Why, in your opinion, was the

12   Express Scripts investigation of Fusion

13   Pharmacy inadequate?

14         A.    Because, short of an admission of

15   guilt by Fusion that they were submitting

16   fraudulent claims, ESI was taking their word

17   that, you know -- that they weren't committing

18   fraud.

19         Q.    So, tell me what you believe

20   Express Scripts should have done with respect

21   to the investigation of Fusion.

22         A.    Well, first of all, the -- ESI

23   asked Fusion, basically -- I'm just trying to

24   get directly to my report.

25              And I'm recalling a document where

1   they -- you know...

2               So there were situations where

3   ESI -- in Rutkowski's deposition he states

4   that the role of the FWA Unit is to verify

5   that the prescriber prescribed the medication

6   and that the patient received the medication,

7   the pharmacy dispensed the medication.

8               In each of these three situations,

9   ESI just takes their word for it without any

10  further investigation, you know, that those

11  events really happened.

12              So what we -- what we do in

13  investigations is that we verify that

14  information.  And I don't think this was fully

15  verified.

16      Q.   Okay.

17              So let's break those down now.

18              I think you said Mr. Rutkowski said

19  that they verified that the pharmacy received

20  a prescription.

21              Is that right?

22      A.   Right.

23      Q.   Okay.

24              That a member received a

25  prescription.

234

```
 1        A.   Yes.

 2        Q.   And that the pharmacy dispensed the

 3   prescription.

 4        A.   Right.

 5        Q.   Okay.

 6             How -- in your opinion, how do you

 7   verify that a member received the

 8   prescription?

 9        A.   Well, you would ask the member.

10        Q.   Did Express Scripts ask the members

11   in this case?

12        A.   I believe they did.

13             But I don't know if they tied

14   everything together.  I didn't see where that

15   was tied together, where that particular

16   member got that particular prescription.  I --

17   I didn't see that.

18             And as Rutkowski says, you know:

19   Am I saying that the pharmacy is answering

20   accurately or truthfully?

21             Maybe, maybe not, but that's the

22   answer they've provided.

23             I mean, so he's just really, kind

24   of, taking their word that, you know:  Yeah,

25   the member got the prescription and I'm just
```

235

1  going to take their word that they did get it.

2       Q.   Do you believe that the industry

3  standard requires Express Scripts -- or

4  required Express Scripts to do something else?

5            And I'm talking specifically about

6  the member receiving the prescription, just

7  that part of it.

8       A.   Well, I can tell you what we do.

9  We verify outside the system, if you will.

10           So even if we get a UPS or United

11  States Postal Service verification, we then go

12  outside to the tracking system and verify that

13  that patient did get that prescription.

14           We verify it by a third party,

15  which that is standard for investigators to

16  verify information from suspected members or

17  suspected pharmacies.

18      Q.   What if the member says that he or

19  she received the prescription?

20      A.   I think all of these were -- were

21  sent.  They were not picked up.  I mean, a New

22  York member isn't going to drive to Salt Lake

23  and get a -- or Utah and get a prescription.

24      Q.   Did you see where Express Scripts

25  reached out to members and asked the member if

236

1  he or she received the prescription?

2       A.   I believe they sent prescrip- --

3  patient provider letters.

4            I don't see where it got tied back

5  to specifically these prescriptions, but --

6            (Simultaneous speaking.)

7       Q.   Did you --

8       A.   -- so --

9       Q.   Did you see any members provide

10 letters back, verifying that they received the

11 prescriptions from Fusion Pharmacy?

12      A.   Yes.  Some of the members did

13 receive prescriptions from Fusion.

14      Q.   So in that case would you agree

15 that Express Scripts verified that the member

16 received the prescription?

17      A.   Yes.

18           And, as Rutkowski says, they may or

19 may not have been providing the truth.

20      Q.   What else was Express Scripts

21 supposed to do with respect to verifying that

22 a member received a prescription, other than

23 send a letter asking the member?

24      A.   As I just said, they could have

25 tracked that separately from the postal

237

1  service that delivered it.

2        Q.   Did you see where Express Scripts

3  asked Fusion Pharmacy for delivery receipts

4  for the prescriptions it was looking at?

5        A.   Yes.

6        Q.   Did Fusion Pharmacy provide the

7  delivery receipts?

8        A.   Yes.

9             But they -- I don't think they

10  verified them through an outside tracking

11  service.

12       Q.   In this case, who was the delivery

13  service that sent the prescription?

14       A.   UPS or FedEx or United States

15  Postal Service.  I -- I can't remember which

16  one.

17       Q.   I want you to assume it's FedEx.

18             What do you believe Express Scripts

19  was supposed to do other than obtain the

20  delivery receipts from Fusion?

21       A.   Go to the U- -- go to the FedEx

22  tracking services -- tracking number service

23  and verify that that did get received.

24       Q.   Do you know how long you're able to

25  go into FedEx's system and track the tracking

238

1    number?

2         A.   Oh, I -- I think it's a fairly long

3    time.

4              And --

5              (Simultaneous speaking.)

6         Q.   Go ahead.

7         A.   No.  Go ahead.

8         Q.   What -- and if I understand it, the

9    basis for your opinion that Express Scripts

10   needed to go to a third-party vendor -- or I

11   guess in this case UPS, USPS or Federal

12   Express -- and actually confirm the tracking

13   numbers, what's the basis for that opinion?

14        A.   Because that verifies it through a

15   third-party, objective source.

16        Q.   And do you believe that is the

17   industry standard?

18        A.   That's what we do.

19        Q.   And other than what you do, do you

20   have any basis that that's the industry

21   standard?

22        A.   Again, there's no bible on industry

23   standard here.

24              So I have heard from other

25   investigators that that's what they do, as

239

1    well.  They go outside.

2            I mean, I don't think that we're

3    geniuses for figuring this out.

4        Q.   What other investigators told that

5    you that's what they do, they go outside?

6        A.   I -- I don't remember who I've

7    talked to.

8            But, again -- (pause) --

9        Q.   Are you aware of any articles,

10   studies, that show that a PBM needs to

11   independently verify from Federal Express,

12   USPS or UPS the delivery of the medication?

13       A.   No.  But I do know that

14   investigative techniques are to verify through

15   an outside party, an outside, unbiased party.

16   That's what investigators do.

17       Q.   Do you believe -- or I guess:

18   What, if anything, else should Express Scripts

19   have done with respect to the investigation of

20   Fusion Pharmacy?

21       A.   Regarding a delivery of the

22   medication or in general?

23       Q.   Okay.

24            Well, in general.  I think we've --

25   we've covered the delivery of the medication,

240

1  unless there's something else they should have

2  done other than verify with Federal Express,

3  USPS or UPS.

4        A.   No.

5             So anything addition- -- additional

6  do that?

7             I do think they should have asked

8  wholesalers for the actual purchase orders,

9  invoices, that Fusion really did buy all of

10 these medications.

11       Q.   What did Express Scripts ask the

12 wholesalers for?

13       A.   I don't think I -- I saw anything.

14 I think that what I remember seeing was ESI

15 asked Fusion what wholesalers they used.

16       Q.   Did you -- did you review any

17 information directly from wholesalers to

18 Express Scripts?

19       A.   No.

20       Q.   Would that have been relevant --

21 relevant to your opinion regarding the

22 information that Express Scripts received from

23 wholesalers?

24       A.   Yes, of course.

25       Q.   Is there anything else that you

247

1        Q.   Ma'am, there's nowhere in your

2   report about what drugs were on some

3   harmful -- an FDA harmful list.

4            So I'm just asking you today as to

5   what you know.

6            Do you know if any of the drugs

7   that are ingredients that Fusion Pharmacy

8   dispensed were on an FDA harmful list?

9        A.   Yes.

10           And I would have to bring up both

11  the list and the documentation that Rutkowski

12  got, and I could correlate that for you.

13           But I don't -- I did not memorize

14  it.  I'm sorry.

15       Q.   And you didn't include it in your

16  report either, did you?

17       A.   I'm sorry.  I did not.

18           (Pause.)

19           Because again, to me, there were so

20  many red flags here.

21       Q.   Do you know if the contract between

22  Express Scripts and Fusion allows Express

23  Scripts to terminate Fusion for red flags?

24       A.   No, I don't.

25           But, again, the point of me saying

251

1   and "audit."

2           Can you explain that or break that

3   down for me?

4       Q.   Did you see a spreadsheet that

5   identified tens of -- dozens of audits of

6   Fusion Pharmacy?

7       A.   I saw a spreadsheet that was a

8   chronological series of events.  We asked for

9   patient verification.  We asked for this.  We

10  asked for that.  So I did see that.

11          I guess I was concerned on that one

12  audit.

13      Q.   Understood.

14          Did you review anything that showed

15  Express Scripts performed an on-site audit of

16  Fusion Pharmacy?

17      A.   No.

18      Q.   Would that have been relevant to

19  your opinion?

20      A.   Yes.

21          But, I mean, which opinion?  I

22  guess, is the question.  I have three opinions

23  in this matter.  And it certainly wasn't

24  relevant to the Opinion No. One or Opinion

25  No. Three.

252

1        Q.   Would it have been irrelevant if

2   you offered an opinion as to Express Scripts'

3   investigation/audit of Fusion Pharmacy?

4        A.   If they had done an -- an on-site

5   investigation, yes.  It would have been

6   relevant to Opinion Two, in that thought.

7        Q.   In your review of the information

8   related to Fusion Pharmacy, are you aware of

9   any documentation, other evidence, that any

10   claim submitted by Fusion Pharmacy was

11   fraudulent?

12        A.   Was I -- I'm sorry.  I'm -- I'm

13   trying to understand the question better.

14             Was I aware -- am I aware of Fusion

15   Pharmacy submitting fraudulent claims?

16             Is that what you're saying?

17        Q.   Yes.

18        A.   I mean, outside this case or within

19   this case?

20             I --

21             (Simultaneous speaking.)

22        Q.   Let me --

23        A.   -- (inaudible) --

24        Q.   Let me break it down.

25             Did you see any evidence that

253

1    Fusion Pharmacy submitted a claim to Express

2    Scripts in which the member did not

3    receive...?

4         A.   No.

5              I do know now that Fusion Pharmacy

6    was involved in healthcare fraud and kickback

7    schemes.

8         Q.   And what's the basis for that

9    opinion, ma'am?

10        A.   It's not in my report, but it is

11   available -- well, let me take that back.

12             I want to make sure, you know, that

13   I'm correct.

14             So -- it's not in my report.  If it

15   is -- if I subsequently find something, I will

16   add it.

17        Q.   Ms. Hayes, sitting here today, do

18   you have any basis for the statement that

19   Fusion was involved in a -- in a kickback

20   scheme?

21        A.   No.

22        Q.   So let me go back again.

23             I think you said you did not see

24   any evidence that a claim submitted by Fusion

25   to Express -- I'm sorry -- that Fusion

254

1   submitted a claim to Express Scripts that a

2   member did not receive.

3        A.   I -- I've answered that, really, a

4   lot.  I'm sorry.  We've gone through the

5   whole:  Did they receive it?

6             How would you have verified it?

7        Q.   I --

8             (Simultaneous speaking.)

9        A.   So --

10       Q.   -- understand.

11            I'm asking you:  In your review of

12  all the documents of Fusion Pharmacy, did you

13  see any evidence that Fusion Pharmacy

14  submitted a claim to Express Scripts in which

15  a member or patient did not receive...?

16       A.   I'm not sure.  I'm not sure I went

17  through every single one of Fusion's claims

18  and then kicked it over to a delivery

19  manifest.  I did not do that, no.

20       Q.   Did you see any evidence in the

21  documents that you reviewed that Fusion

22  Pharmacy submitted a claim to Express Scripts

23  without a valid prescription?

24       A.   I didn't look at every one of --

25  no, I did not do that.  I did not look at

255

1    every one of Fusion's prescriptions.

2            So I -- I can't say "yes" or "no."

3        Q.   You certainly didn't -- sitting

4    here today, you can't tell me about something

5    you saw or a piece of evidence or a piece of

6    paper that you saw, in which Fusion submitted

7    a claim to Express Scripts without a valid

8    prescription.

9            MR. SHIFRIN:  Objection.  Asked and

10        answered multiple times now, Sarah.

11            MS. HELLMANN:  Go ahead, Ms. Hayes.

12            THE WITNESS:  I can't say that.  I

13        can't say one way or the other.

14            What I did see -- what I did see

15        was that there was a prescription.

16        Whether it was valid or not -- that's

17        why I'm struggling with the question.

18            Whether it was valid or not, I

19        don't know.  I didn't independently

20        review it.  I didn't independently

21        review it with a physician.  I didn't

22        independently review it with a patient.

23        I don't know, sitting here, if it was

24        valid.

25            And I certainly did not look at

256

1    100 percent of Fusion's claims

2    submissions and whether or not they were

3    valid.

4         To me, they looked highly

5    suspicious because of the "check the

6    box" nature of the prescription orders.

7    That's not how a compound prescription

8    is typically, if it is a valid

9    prescription, written, because it means

10   that there's a multiple amount of

11   patients that might be getting that

12   prescription.

13        It raises red flags to me.  It --

14   it makes me want to do a more thorough

15   investigation when I see something like

16   that.

17        So I cannot sit here and say every

18   one of Fusion Pharmacy's prescriptions

19   that were submitted to ESI on behalf of

20   the New York City Transit Authority were

21   valid or were not valid.  I cannot say

22   that, no.

23        MS. HELLMANN:  Thank you.

24        Why don't we take a break.

25        Ten minutes?

258

1        Q.   Okay.

2             Is there anything else you believe

3   that Express Scripts should have done in

4   addition to the investigation -- or the steps

5   that it took with respect to Fusion?

6        A.   Well, again, I think I've said this

7   earlier.  If I didn't, I want to make it

8   really clear.

9             There were a lot of prescriptions

10  that were sent to -- that were sent by Fusion

11  Pharmacy through ESI, and ultimately paid for

12  by New York City Transit Authority.

13            I saw a handful of prescriptions

14  that were requested and a handful of copies of

15  delivery manifests.

16            I think a more thorough

17  investigation would have been to have looked

18  at many more, many more.

19            I -- I don't really see the results

20  of a lot of the investigation that Rutkowski

21  did.  So I'm -- I'm working from memory here.

22  I'm working from what I remember seeing in the

23  documentation, again, a handful, I'm going to

24  say 20 or 30, compared to the -- you know,

25  let's look back at Aon's report.

259

1            How many -- how many prescriptions

2   did Fusion, you know, send through?

3            Quite more than a handful.

4            I'm saying a more thorough -- you

5   know, with $29 million' worth, a more thorough

6   investigation should have been done other than

7   a handful of prescriptions.

8        Q.   And so -- (communications

9   breakup/inaudible) -- understanding --

10  (communications breakup/inaudible) -- and if I

11  understand you, Express Scripts should have

12  looked at more claims -- or asked for, you

13  know, verification for more prescription drug

14  claims other than a handful.

15           Is that accurate?

16       A.   That is accurate.

17       Q.   And is there a -- a number that you

18  believe Express Scripts should have asked for

19  in terms of the number of claims that it

20  should have looked at?

21       A.   Again, you know, $29 million went

22  to Fusion Pharmacy, based on the Aon report

23  here, and I'm sure that was not a handful of

24  prescriptions, something more than a dozen or

25  so prescriptions.

269

1  personal body guard or something to that

2  effect, where it's just one person, you know,

3  a personal assistant, a -- you know, that --

4  that's protecting, you know, an individual

5  in -- in their affairs.

6            So that's -- that's what I see this

7  as.

8            And Illinois has a similar statute,

9  and obviously I've passed the exam in Illinois

10  and that's what we interpret that as to be.

11            So that's not someone doing routine

12  investigations, you know, of other businesses.

13  That's someone that is just involved in the

14  affairs of that employer and there's an

15  employer-employee relationship.

16       Q.  Are you aware of any PBMs that have

17  licensed investigators in its Fraud, Waste &

18  Abuse Department?

19       A.  I can't tell you as I sit here.  I

20  have no idea.  I have not looked at every

21  single PBM.

22            I -- I'm -- I'm sure that

23  somewhere, somehow, some PBM has a private

24  investigator.

25            I know that ex-law-enforcement do

270

1  go into this work after they retire from, you

2  know, law enforcement duties.

3       Q.   Okay.

4            But sitting here today, you can't

5  tell me a PBM that has licensed private

6  investigators.

7       A.   I also can't tell you one that

8  does -- or doesn't, no.  I can't tell you one

9  way or the other.

10           It was outside the scope of my

11  review, to look at, you know -- like I said,

12  I -- I mean, I do, just as a -- as a -- I do

13  know someone that worked for the government

14  for, you know, 20 years and then retired and

15  now works at a PBM, and they do have a

16  licensure.

17           So I -- you know, that's just

18  anecdotally.  I don't know if that is the

19  practice of that particular PBM or not, but...

20      Q.   What PBM --

21           (Simultaneous speaking.)

22      A.   And that doesn't make it right,

23  either that.  Doesn't make it right if PBMs

24  don't hire licensed professionals.  It doesn't

25  make it right.

271

1          You know -- you know, didn't your

2    mother say, you know, growing up that, "If" --

3    "If all the rest of the kids do it, doesn't

4    mean you can do it"?

5          So that's, kind of, the application

6    here, you know.  Just because other PBMs don't

7    see fit to abide by the law doesn't mean, yes,

8    I shouldn't.

9          MS. HELLMANN:  Beth, can we pull up

10        the next exhibit, please.

11        MS. BOZICEVIC:  Just one --

12        (communications breakup/inaudible) --

13        now.

14        MS. HELLMANN:  Sure.

15        (Exhibit No. 124 Marked.)

16        (Pause.)

17        MS. BOZICEVIC:  All right.

18        ESI Exhibit 124 has been added to

19        the chat.

20     Q.  (BY MS. HELLMANN)  Let me know when

21    you have that open, ma'am.

22     A.  Okay.

23        I have it open and I'm now looking

24    at it.

25     Q.  And, Ms. Hayes, this was -- this

279

1   patients could have been treated with

2   manufactured products that were a fraction of

3   the cost, and that is the question ESI should

4   have been asking.

5        Q.   You talked earlier about the number

6   of claims that Express Scripts looked at with

7   respect to Fusion.

8             I think you were critical that

9   Express Scripts didn't look at enough claims.

10  True?

11       A.   True.

12            MS. HELLMANN:  Beth, can we put up

13       the next -- whatever the next exhibit

14       is?

15            (Exhibit No. 125 Marked.)

16            MS. BOZICEVIC:  The document that

17       we've marked as ESI Exhibit 125 is a

18       native spreadsheet, and the Bates Number

19       for that native spreadsheet is

20       ESI 241790.

21       Q.   (BY MS. HELLMANN)  Ms. Hayes, I

22  will tell you that I also do not see this

23  document on the list of documents you

24  reviewed.

25            Is it something that's familiar to

280

1   you?

2          A.    No.

3          Q.    Do you have any idea what this

4   document represents?

5          A.    No.

6          Q.    Do you know if it's the number of

7   audits that Express Scripts did of various

8   pharmacies, including Fusion?

9          A.    No, I don't know.

10              MS. HELLMANN:  Beth, could you put

11         up the next exhibit?

12         Q.    (BY MS. HELLMANN)  While she's

13  doing that, Ms. Hayes, would knowing the

14  number and extent of other audits Express

15  Scripts conducted of Fusion -- Fusion Pharmacy

16  been relevant in forming your opinion?

17         A.    Well, it certainly would have been

18  relevant, but I would have wanted to make sure

19  that the audit was -- you know, I didn't

20  independently audit these.

21              So I don't know if I would have

22  agreed -- you know, I saw, "Claim okay,"

23  "Claim okay," "Claim okay."

24              I don't know if I would have come

25  to that conclusion.  So -- but...

281

```
 1              Okay.  Now, I have the second Excel

 2   sheet in front of me.

 3              MS. HELLMANN:  Beth, can you read

 4         that one into the record, please.

 5              MS. BOZICEVIC:  Sure.  This is ESI

 6         Exhibit 126.

 7              (Exhibit No. 126 Marked.)

 8              MS. BOZICEVIC:  And I do not have

 9         the Bates Number in front of me,

10         unfortunately.

11         Q.   (BY MS. HELLMANN)  Let me ask you

12   this, Ms. Hayes:  Is this document familiar to

13   you?

14         A.   No.

15         Q.   This was not a document that was

16   sent to you?

17         A.   It doesn't look familiar to me.  I

18   don't think I used it.  I don't think it's in

19   my list of documents that I used, so, no.

20         Q.   That is correct.  It is not.

21              Do you know what this document

22   represents?

23         A.   No.

24         Q.   Do you know whether it shows

25   additional audits that Express Scripts
```

282

performed of pharmacies, including Fusion

Pharmacy?

        A.   I would -- I would obviously have

to do some analysis on this file to see what

this is.

            I see in Column B there's a name of

a pharmacy.  But I would have to, you know,

put a filter on it and see if -- how many were

done.

            I -- no.  I don't know.  I'm just

looking at this document for the first time.

        Q.   That was information that was not

provided to you, correct?

        A.   I have not seen this document, no.

        MR. SHIFRIN:  Sarah, can we have

        the Bates Number when you get a chance?

        MS. BOZICEVIC:  I'm sorry.  It is

        Express Scripts 241789.

        MR. SHIFRIN:  Thank you.

        Q.   (BY MS. HELLMANN)  Ms. Hayes, I

want to talk a little bit about the third

opinion you have in this case.

        A.   Ma'am, can I -- can I get rid of

these -- not get rid of them, but can I close

these Excel?

283

1        Q.   Sure.

2        A.   Okay.

3             Okay.  Go ahead, please.  I'm

4    sorry.

5        Q.   What is spread pricing?

6        A.   Spread pricing is when the pharmacy

7    is reimbursed less than the plan sponsors was

8    charged and the PBM keeps the difference.

9        Q.   And why is the fact that the

10   contract between Express Scripts and Transit

11   contains spread pricing relevant to your

12   opinions in this case?

13       A.   Because there was a financial

14   interest in having claims adjudicated and not

15   having claims not adjudicated, because a

16   spread was retained when a claim was

17   adjudicated, not when a claim was not

18   adjudicated.

19       Q.   And in your opinion you cite a

20   study that spread pricing accounts for ten

21   percent of the claim.

22            What study is that?

23       A.   The State of Ohio did -- the

24   Controller's Office in the State of Ohio did a

25   study where they looked at the managed

287

1    than spread pricing.

2         Q.   And so if I hear -- if I understand

3    your opinion, is it that Express Scripts has

4    no motive or incentive to control fraud, waste

5    and abuse due to spread pricing?

6         A.   That is my opinion, yes.

7         Q.   Is that opinion related to Express

8    Scripts or PBMs in general?

9         A.   PBMs whose basis of charging

10   clients is spread pricing, yes.

11        Q.   Would you agree -- and I think you

12   say this in your report -- that contracts

13   between a PBM and a client can be -- have

14   spread pricing or -- I think you call it

15   pass-through pricing.

16             Is that the other mode of pricing?

17        A.   Yes.

18        Q.   Then flipping to pass-through

19   pricing, do you believe that a PBM has motive

20   or incentive to control fraud, waste and abuse

21   under a pass-through pricing contract?

22        A.   Well, I think there's more

23   motivation because you're paid a flat fee,

24   either a per claim or per member fee, and it

25   doesn't matter, you know, if zero claims go

292

conveyed in writing to New York City Transit
that it was going to monitor the network.

         And I'm saying that because of the
way -- you know, you've got to ask:  Okay.
Well, what was ESI's motive if they didn't
investigate this $67 million' worth of
compounds?

         Well, one of the motives might have
been financial.

         And when you think about it, spread
pricing would give you a motive for not
investigating and turning off the spigot of
compound prescriptions.

     Q.   And do you believe that Express
Scripts had that motive?

     A.   I have not interviewed anyone at
Express Scripts to understand their motives.

         I'm just saying that I'm -- the
contract is spread pricing, $67 million' worth
of the compounds got paid, and -- and I'm
saying:  Where is the disconnect here?

         As I say very clearly in my report,
ESI had financial incentives to process
excessive compound prescriptions.

         I didn't say that that was their

306

1    close this.

2            You believe that Express Scripts

3    had a duty and responsibility to ensure that

4    claims were covered, correct?

5        A.   Yes.

6        Q.   You haven't seen evidence whether

7    Express Scripts complied with this duty or

8    didn't comply with this duty.

9            MR. SHIFRIN:  Objection --

10           (Simultaneous speaking.)

11           THE WITNESS:  I --

12           MR. SHIFRIN:  -- form.

13           THE WITNESS:  Go ahead,

14       Mr. Shifrin.

15           MR. SHIFRIN:  Object to form.

16           THE WITNESS:  Sorry to interrupt.

17           MR. SHIFRIN:  Go ahead.

18           THE WITNESS:  What I see here is

19       they covered drugs that are potentially

20       questionable and I saw no evidence that

21       they questioned them.  That is the --

22       that is my testimony.

23           MS. HELLMANN:  Okay.  I understand.

24       Q.   (BY MS. HELLMANN)  With respect to

25    the opinion about the -- the red flags you

307

1  believe that Express Scripts should have

2  noticed in the data and communicated to

3  Transit, are you aware of -- or do you know of

4  any articles, studies, regarding when a PBM

5  tells a client about red flags and data?

6          A.   You know, maybe this is something

7  that I should undertake post-this-situation,

8  is to write a book about it.

9               I have not seen a book on how PBMs

10 should manage prescription drugs for their

11 clients, no.  I've not seen that book.

12              But what I have seen in 25 years of

13 going to quarterly meetings every quarter in

14 25 years -- so if we do the multiplication,

15 that's like a hundred meetings -- what I've

16 seen in the hundred situations is that PBMs

17 will go through major areas of concern -- and,

18 gee, a million dollars in compound drugs is an

19 area of concern -- and review that with their

20 clients and try and come up with ways to

21 better manage that level of spend.

22         Q.   Ms. Hayes, do you know if New York

23 City Transit covered lidocaine?

24         A.   Well, clearly they must have,

25 because they paid for it.