**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
NEW YORK CITY TRANSIT AUTHORITY,       :

      :    Case No. 1:19-cv-5196-JMF

      :

      :

      :

      :

EXPRESS SCRIPTS, INC.       :

      :

      :

----------------------------------------------------------------- X


**THE NEW YORK CITY TRANSIT AUTHORITY'S MEMORANDUM OF LAW IN**
**OPPOSITION TO EXPRESS SCRIPTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...........................................................................................1

**FACTUAL BACKGROUND**...............................................................................................3

   The NYCTA/ESI Contract ...........................................................................................3

   The Compound Spike .....................................................................................................5

   NYCTA Staff Acted Diligently Even Though ESI Failed To Exercise Reasonable
   Diligence........................................................................................................................5

   ESI's Undisclosed July 2016 Investigations Of Fusion And Dr. Honig..................6

   The January 2017 Fraud Tip.........................................................................................7

   The NYCTA Discovers Fusion......................................................................................7

   The NYCTA Discovers Dr. Cohen ...............................................................................8

   The Dr. Cohen Investigation Reports...........................................................................9

   The Compound Management Solution And The NYCTA's Collective Bargaining
   Restrictions ...................................................................................................................9

**LEGAL STANDARD**.........................................................................................................11

**ARGUMENT**

**ESI HAS FAILED TO CARRY ITS INITIAL BURDEN DEMONSTRATING AN
ENTITLEMENT TO SUMMARY JUDGMENT** ..................................................12

     I.    ESI Mischaracterizes The NYCTA's Claims.......................................................12

     II.   The Contract Required ESI To Apply Reasonable Care And Industry Expertise
           Rather Than Withhold Egregious Outliers And Red Flags...................................13

           A.   The Contract Contained A Duty To Meet An Industry Standard Of
                 Care And Reasonable Diligence ...........................................................14

           B.   The Contract Contained A Duty To Process Claims And Provide
                 Customer Service In A Prudent And Expert Manner..............................14

           C.   The Contract Contained A Duty To Conduct Due Diligence In The
                 Selection And Retention Of Its Network Pharmacies .............................15

           D.   The Contract Contained A Duty To Repay Overpayments .....................16

E.     ESI Includes Basic Fraud Protection With Its Core Services And The Enhanced Fraud Protection Under Section 4.35 Is Irrelevant..................16

III.    ESI Failed To Identify And Then Withheld Egregious Cost Data And Red Flags From The NYCTA.....................................................................17

A.     ESI Failed To Identify Egregious Pharmacy And Prescriber Outliers, Including Fusion Pharmacy, Dr. Cohen, and Dr. Honig .........................18

B.     ESI Withheld From The NYCTA Red Flags It Discovered In Fraud, Waste And Abuse Investigations That Specifically Implicated The NYCTA...................................................................................................20

C.     ESI Failed To Tell The NYCTA That A Fraud Tip It Received Implicated Fusion, Dr. Honig And The Red Flags It Had Already Identified..............................................................................................21

D.     The NYCTA Did Not Need An Enhanced Fraud Program To Protect Itself From These Basic Failures............................................................22

IV.    ESI's Failures To Convey Egregious Cost Data And Red Flags Caused The NYCTA's Damages, Regardless Of The Plan Design.........................22

V.     The NYCTA Disclosed Its Damages In Discovery And Will Prove Damages At Trial Through Summary Evidence Of The Claims Data...............................23

CONCLUSION .........................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................11

*Chambers v. TRM Copy Ctrs. Corp.*,
  43 F.3d 29 (2d Cir. 1994) ..........................................................................11

*Design Strategy, Inc. v. Davis*,
  469 F.3d 284 (2d Cir. 2006) ......................................................................24

*Gould Paper Corporation v. Madisen Corp.*,
  614 F. Supp. 2d 485 (S.D.N.Y. 2009) .......................................................24

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir.2010) .......................................................................11

*Overton v. N.Y. State Div. of Military & Naval Affairs*,
  373 F.3d 83 (2d Cir. 2004) ........................................................................11

*Ritchie Risk-Linked Strategies Trading (Ire.), Ltd. V. Coventry First LLC*,
  280 F.R.D. 147 (S.D.N.Y. 2012) ...............................................................24

*Salahuddin v. Goord*,
  467 F.3d 263 (2d Cir. 2006) ......................................................................11

*Scantibodies Lab., Inc. v. Church & Dwight Co.*,
  No. 14cv2275, 2016 WL 11271874 (S.D.N.Y. Nov. 4, 2016) ...................24

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
  391 F.3d 77 (2d Cir. 2004) ........................................................................11

*Spotnana, Inc. v. Am. Talent Agency, Inc.*,
  No. 09-cv-3698, 2010 WL 3341837 (S.D.N.Y. Aug. 17, 2010).................24

*Thompson v. Gjivoje*,
  896 F.2d 716 (2d Cir.1990) .......................................................................11

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
  526 F.3d 63 (2d Cir. 2008) ........................................................................11

*United States v. Honeywall International Inc.*,
  Case No. 08-0961, 2020 WL 5793307 (D.D.C Sept. 29, 2020) ................24

## PRELIMINARY STATEMENT

Plaintiff the New York City Transit Authority ("NYCTA") hired defendant Express Scripts, Inc. ("ESI") under a three-year contract for $728 million to manage the pharmacy benefit for NYCTA employees. In the year before ESI took over as the NYCTA's pharmacy benefits manager ("PBM"), the NYCTA employee benefit plan spent approximately $6.3 million on compound drugs. Under ESI's management, the NYCTA's compound spend ballooned to over $38 million in the first year and over $43 million in the second year. The bulk of this money went to a handful of out-of-state pharmacies on prescriptions written by out-of-state prescribers, including a single Utah pharmacy that ESI paid, on the NYCTA's behalf, over $25 million in compounds ("Fusion"), a California orthopedist who authorized nearly $22 million in compounds ("Dr. Cohen"), and a Connecticut physician who authorized nearly $16 million in compounds ("Dr. Honig").

The NYCTA sued ESI because it failed to manage the NYCTA's benefit plan consistent with its contractual obligations. ESI never told the NYCTA about these egregious outliers, never told the NYCTA about red flags it had identified with both Fusion and Dr. Honig, never told the NYCTA that a detailed and specific fraud tip ESI received involving NYCTA employees implicated Fusion and Dr. Honig, and never told the NYCTA ESI had investigated Fusion multiple times—all of which would have enabled the NYCTA to take corrective action earlier in the contract term. These and other failures by ESI to fulfill its basic obligations as the NYCTA's pharmacy benefits manager caused the NYCTA tens of millions of dollars in damages.

In response, ESI, the largest PBM in the country and a Fortune 25 company, argues it owed no duties whatsoever to prevent any of this from happening to its taxpayer-funded, benefit-plan client. It does so by moving for summary judgment based on its own self-created and self-defined term "Fraud Prevention Duties." But this case is not about whether ESI failed to prevent

actual fraud; it is about ESI's far more basic failure to *manage* the NYCTA's pharmacy benefit plan by identifying and communicating egregious and obvious outlier costs, data, and other red flags of fraud, abuse, and/or excess, which is a breach of ESI's basic duties under the contract. This fundamental mischaracterization by ESI is the thread holding its entire motion together—and once that thread is removed, the motion unravels. ESI cannot possibly carry its initial burden on summary judgment to show that its interpretation of the contract is "wholly unambiguous" by devoting its entire opening brief to a standard that does not even appear in the contract instead of rebutting the NYCTA's actual contractual claims.

The balance of ESI's brief is devoted to blaming the NYCTA for ESI's own failure to act as a reasonable and prudent pharmacy benefits *manager.* Under a binding arbitration decision precluding it from unilaterally reducing benefits under a collective bargaining agreement, the NYCTA was unable to institute a solution that would have all but shut off its compound drug benefit altogether. The NYCTA made this clear to ESI, yet ESI took no other basic and available steps to identify egregious and obvious outlier costs and other red flags while keeping the compound benefit in place. Blaming the NYCTA for ESI's own failure to provide reasonable diligence and care in monitoring, processing, and approving compound claims, as required under the contract, is no basis for granting ESI summary judgment.

Nor is ESI's request for the extreme sanction of preclusion on damages. The NYCTA disclosed its damages multiple times during this litigation. And it is perfectly appropriate under the Federal Rules of Evidence to prove its damages by aggregating and presenting summary evidence of the claims data the NYCTA has produced in discovery and which ESI has long had in its possession as the NYCTA's PBM. For these reasons, as detailed below, ESI has failed to meet its burden as the summary judgment movant.

# FACTUAL BACKGROUND[1]

## The NYCTA/ESI Contract

The NYCTA engaged ESI as its PBM in a three-year, $728 million contract that began on April 1, 2016 (the "Contract"). It is undisputed that the NYCTA performed its obligations under the Contract. This action turns only on whether ESI breached its obligations by failing to identify and inform the NYCTA of extreme outlier claims and failing to act quickly to prevent and recover tens of millions of dollars of losses once the NYCTA pointed out the problem.

ESI's duty under Article 4 of the Contract was "to provide pharmacy benefits *management services* for represented NYC Transit employees." (COF" ¶ 2). The very first provision of Article 4 imposed an industry standard duty of care and reasonableness governing all ESI's actions as the NYCTA's PBM:

> In the exercise of its duties under this Agreement, [ESI] shall use that degree of care and reasonable diligence that an experienced and prudent plan administrator of pharmacy benefits under a group health plan familiar with such matters would use acting in like circumstances, and consistent with industry standards.

(SOF ¶ 8). As befitting the largest PBM in the industry under a $728 million Contract running a public authority's pharmacy benefit plan, ESI had to adhere to the industry's customary standard of care in carrying out its services to the NYCTA.

The next provision of Article 4, Section 4.2, specifically imposed that broad expert standard of care on all claims processing and customer service ESI provided to the NYCTA:

> [ESI] shall process Claims during the Term of this Agreement and provide customer service in a prudent and expert manner, including investigating and reviewing such Claims to determine what amount, if any, is due and

---

[1] All facts within this Factual Background section are supported by citation to ESI's Rule 56.1 Statement of Undisputed Material Facts ("SOF") or to the NYCTA's Counterstatement of Facts ("COF") filed contemporaneously with this memorandum of law. All exhibits are attached to the Declaration of Elizabeth A. Bozicevic filed in support of ESI's motion or the Declarations of Maximillian S. Shifrin and Vince Kozlowski filed in opposition to the motion.

> payable according to the terms and conditions of the Plan document and
> this Agreement.

(SOF ¶ 9). Again, ESI was required to *manage* the NYCTA's prescription drug plan and provide

*customer service*, conducting its activities in a manner consistent with leading industry norms

and standards, applying "prudence" and "expertise" while  "investigating" and "reviewing"

claims and not merely processing them.

The Contract also required ESI to comprehensively audit its PBM services to ensure

consistency with these industry standards. Under section 4.16, ESI was obligated to:

> maintain a comprehensive internal audit program for pharmacy benefits
> management services. During these random, internal audits, ESI shall
> include a review of the delivery of appropriate pharmacy benefit
> management services to Participants in accordance with standards in the
> pharmacy benefit management community.

(SOF ¶ 11). This provision placed an affirmative obligation on ESI to ensure its PBM services

met the industry standard of care the Contract incorporates throughout.

The Contract also expressly incorporated the standard of care into ESI's obligation to

pursue and return Overpayments to the NYCTA. The Contract defines Overpayments as

"payments that exceed the amount payable under the Plan and this Agreement*."* (SOF ¶ 13). ESI

was required under Section 4.7 to "pursue recovery" of Overpayments "in accordance with . . .

industry standards." (SOF ¶ 12). The Contract expressly provided that "[ESI] shall be liable for

all un-recovered Overpayments due to [ESI's] breach of this Agreement (including, without

limitation, [ESI's] failure to meet the standard of care)*. . .".* (SOF ¶ 12).

ESI was likewise required to "exercise due diligence" in its management of its pharmacy

network under Section 4.14. This obligation, again incorporating the standard of care that

suffuses all of Article 4, required ESI to:

> exercise due diligence in the selection and retention of Network
> Pharmacies. . . . [and to] maintain . . . quality improvement committees

4

> and medical directors (i) to monitor the quality of prescription drug and
> professional pharmacy services furnished by Network Pharmacies, as well
> as the quality of services [ESI] maintains, and (ii) to direct action as
> appropriate to correct deficiencies.  [ESI] shall maintain during the Term
> of this Agreement, programs to promulgate pharmacy best practices.

(SOF ¶ 10). Consistent with this requirement, ESI was required to "exercise due diligence" and "direct action . . . to correct deficiencies" when there were inexplicable, multi-million dollar spikes in compound claims processed through its pharmacies.

## The Compound Spike

Those anomalies should have become apparent to ESI in the exercise of reasonable diligence at the beginning of the Contract term. In the year before ESI took over as PBM, the NYCTA spent $6,346,620 on compounds; under ESI, the NYCTA spent over $38 million in the first year and over $43 million in the second year. (COF ¶¶ 6-8). The NYCTA's monthly compound spend immediately, steadily, and noticeably increased, from $1,046,995 in April 2016 to $7,234,085 in March 2017. (COF ¶ 7). Three egregious outliers—Fusion, Dr. Cohen, and Dr. Honig—alone accounted for over $41 million in unique compound claims. (COF ¶ 12).

## NYCTA Staff Acted Diligently Even Though ESI Failed To Exercise Reasonable Diligence

The NYCTA identified early red flags and demanded ESI closely monitor compound spend. Between April 20, 2016 and June 15, 2016, ESI processed three claims for an erectile dysfunction compound drug for one NYCTA employee that cost $405,326.43. (COF ¶ 15). After noticing these charges, Jim Masella, the NYCTA's Vice President of Benefits, wrote to Erik Ruebenacker, the supervising Account Executive at ESI for the NYCTA account, stating that

> [t]his highlights the need for a report from ESI that identifies any costs
> that are extraordinary and merit closer scrutiny regarding all drugs not just
> compounds. Please produce such a report and let me know when I can
> expect it.

(COF ¶ 16). ESI failed to sufficiently respond to this request, so Mr. Masella again wrote to Mr.

Ruebenacker:

> My issue with ESI is about flagging any charges that are extraordinary. This charge is extraordinary. Whenever you find such charges you should be taking corrective action. At minimum, stop allowing this pharmacy from filling prescriptions for any of my members. This morning I asked your team to do this. I'm surprised that this wasn't conveyed to you. If it was, I'm disappointed that that you didn't acknowledge this in your email and indicated [sic] that you have have [sic] implemented my request. If you can't execute my request, pls [sic] explain."

(COF ¶ 17). ESI subsequently sent the NYCTA reports identifying compounds costing more

than $15,000. (COF ¶ 18). At no point did ESI ever contend that affirmative monitoring and

reporting of outlier compound claims was inconsistent with ESI's obligations.

### ESI's Undisclosed July 2016 Investigations Of Fusion And Dr. Honig

ESI investigated Fusion and Dr. Honig early in the Contract term after noticing aberrant

activity that uniquely implicated the NYCTA's benefit plan. Between July and October 2016,

Fusion filled $4,217,832 in compounds for NYCTA members—*all* prescribed by Dr. Honig.

(COF ¶ 10). On September 21, 2016, ESI's Fusion investigator identified these and other red

flags, keying in on Fusion's impact on the NYCTA in a letter to Fusion's owner:

- Many of the prescriptions, regardless of the Prescriber, appear to originate or pass through a common fax number, suggesting involvement of a third party.

- Several of the prescriptions are transfers from Manhattans Pharmacy, based in Florida.

- There appear to be significant delays between the dates the prescriptions were written by the Prescribers and the dates they were transmitted to the pharmacy to be filled.

- 89 percent of Fusion's claims within the most recent 12 months of the investigation time frame can be attributed to members located in New York.

- Claims from one prescriber, who is based in Connecticut, account for 63 percent of the claims within the most recent 12 months of the investigation time frame. Of note, none of the members for whom he wrote prescriptions appears to be based in Connecticut.

- Another Prescriber, based in the state of New York, accounts for 24% of claims within the most recent 12 months of the investigation time frame.

("Fusion/Honig Red Flags") (COF ¶ 38). ESI's retained expert testified that the Fusion/Honig Red Flags were indeed red flags and that Fusion's adamant denials were also red flags. (COF ¶ 40). At the same time, ESI investigated Dr. Honig's prescribing activity through Fusion, sending patient verification letters to dozens of NYCTA members. (COF ¶ 49). ESI disclosed none of this to the NYCTA, even as ESI continued to approve and process $13,598,145 in compounds authorized by Dr. Honig through Fusion between July 2016 and April 2017 alone. (COF ¶ 10)

**The January 2017 Fraud Tip**

In early January 2017, ESI received a detailed tip regarding "a medical insurance fraud scheme involving employees of the NYC MTA Bus Operations/Yukon Garage in Staten Island, NY" (the "Fraud Tip") (COF ¶ 50). ESI identified Fusion and Dr. Honig as the top pharmacy and prescriber implicated in this scheme, noted its previous investigations of both, and conveyed these findings to the ESI Accounts Team servicing the NYCTA—yet the Accounts Team did not disclose any of that information to the NYCTA. (COF ¶¶ 51-55). Despite the fraud tip, the Fusion/Honig Red Flags, and knowledge of both being provided to the Accounts Team working day-in and day-out with the NYCTA, ESI continued to approve, process, and pay millions of dollars of compound claims made through Fusion Pharmacy and Dr. Honig. Between January and April 2017, Fusion filled an additional $15,953,501 in compound claims for NYCTA members. (COF ¶ 55).

**The NYCTA Discovers Fusion**

Eventually, months and tens of millions of dollars in paid claims later, without any help from ESI, the NYCTA identified the problem. On March 29, 2017, Jim Masella raised the issue with ESI, writing that:

> Aon's quick review of compound claims shows a spend of over $20M this [sic] one pharmacy in UTAH. Meanwhile your 9 month report shows a total compound spend of $21.7M. Clearly something is wrong. Please give me a call as soon as you can so that we can discuss your controls that should have identified this.

(COF ¶ 56). At Mr. Masella's direction, ESI blocked Fusion from processing claims for the NYCTA on April 21, 2017. (COF ¶¶ 57-61). Mr. Masella also demanded ESI review data for pharmacies generating the highest compound spend and directed ESI to block those pharmacies. In total, through this reasonable diligence process demanded and directed by the NYCTA, ESI blocked 34 pharmacies in 2017 and 2018. (COF ¶ 67). ESI subsequently terminated 11 of these pharmacies from its pharmacy network after its investigations substantiated fraudulent conduct. (COF ¶ 84). The NYCTA spent $62,121,247 on compounds through the 34 pharmacies it blocked, including $16,013,510 through the 11 pharmacies ESI terminated from its network for fraud (COF ¶¶ 83-85).

**The NYCTA Discovers Dr. Cohen**

In January 2018, one year after ESI received the fraud tip and nine months after the NYCTA identified the Fusion problem for ESI, the NYCTA's Mary Beese reviewed a file on compound spend provided by ESI and asked ESI for data on prescriptions written by Dr. Cohen, noting that "[she] count[ed] 488 out of 1,621 prescriptions on this file alone" were written by Dr. Cohen. (COF ¶ 68). When ESI provided the information Ms. Beese requested, the NYCTA learned Dr. Cohen authorized nearly $20 million worth of compound prescriptions in 2017, including over $8 million through Fusion between January and April 2017. (COF ¶ 11). Ms. Beese requested ESI investigate Dr. Cohen and Dr. Honig and spent months following up with ESI on the status of those investigations. (COF ¶¶ 68-78). As a result of Ms. Beese's efforts to obtain additional data on prescribers from ESI, the NYCTA directed ESI to block 26 prescribers from issuing further prescriptions through its plan. (COF ¶ 79). ESI apparently did nothing until

its customer, the NYCTA, exercised some basic diligence, asked some key questions, and demanded its pharmacy benefits manager act. Nor did ESI ever contend that any of the steps the NYCTA directed it take were inconsistent with its PBM obligations.

### The Dr. Cohen Investigation Reports

After Ms. Beese repeatedly requested Dr. Cohen be investigated, ESI produced a 2019 Investigation Report on Dr. Cohen to clients enrolled in its enhanced fraud program,[2] which revealed that (i) in 2015, "Dr. Cohen was charged with filing a false tax return and admitted to failing to report income from $1.64 million in kickbacks . . . from a scheme in which thousands of patients were illegally referred for spinal surgeries"; (ii) Dr. Cohen pleaded guilty in 2018 to filing a false tax return; (iii) his New York medical license was suspended for 24 months and he was placed on probation for 36 months and fined $5,000; and (iv) ESI referred Dr. Cohen to the New York State Office of the Professions. (COF ¶¶ 86-89). By the time ESI issued its report, Dr. Cohen already authorized $22 million in compounds for NYCTA members. (COF ¶ 11).

### The Compound Management Solution And The NYCTA's Collective Bargaining Restrictions

The NYCTA informed ESI before the Contract term that a 2004 binding arbitration decision precluded it from implementing any programs reducing prescription drug benefits. (COF ¶ 90). ESI's Compound Management Solution ("CMS"), which controls compound spend by rejecting compound claims that contain any one of thousands of ingredients, was one such program. (COF ¶ 92). Because other public sector clients, such as the U.S. Department of

---

[2]  It is undisputed that ESI provides basic fraud, waste, and abuse protection through "a combination of various core services" and administers an "enhanced" fraud program for an additional fee. (SOF ¶ 15; COF ¶¶ 27-31). The basic program involves pharmacy and prescriber investigations based on trends ESI observes across its entire book of business—not on a client-specific level. (COF ¶¶ 27-31). ESI witnesses testified that the only distinctive feature of the enhanced program is that enrolled clients receive Investigation Reports for the prescribers ESI investigates through its network-wide basic fraud program. (COF ¶¶ 27-31). The pharmacy investigations are unaffected by a client's enrollment in the enhanced program, and clients in the enhanced program do not receive pharmacy-specific reports. (COF ¶¶ 27-31)

Defense's TRICARE program and New Jersey Transit's benefit plan, also had previously not enrolled in the CMS, ESI knew clients unable to implement it were more vulnerable to compound drug fraud and egregious compound spend. (COF ¶¶ 93-97). In 2015, the TRICARE benefit plan experienced an egregious spike in compound costs much like the NYCTA's compound spike in 2016 and 2017. (COF ¶¶ 4-5). The TRICARE spike also involved a large-scale kickback scheme costing it over $100 million and resulting in multiple convictions. (COF ¶ 4).

The NYCTA declined to renew its Contract with ESI, and the Contract terminated on May 31, 2019. Just before the end of the term, on the eve of renegotiating its collective bargaining agreement and facing a substantial fiscal crisis, the NYCTA unilaterally imposed the CMS. A sharp decrease in compound claims resulted, and the Union filed a grievance against that unilateral action that was never ultimately arbitrated. (COF ¶ 99).

ESI filed an Article 78 proceeding to challenge the NYCTA's transition to another PBM. ESI's challenge to that transition was rejected by the Supreme Court, New York County and by the Appellate Division, First Department. The deficiency in ESI's performance under the Contract was summed up by the NYCTA's Jim Masella in his deposition testimony when he was discussing his efforts to get ESI to monitor compound spending, alert him to spikes, and help protect the NYCTA benefit plan's fisc:

> This is the whole point of having a PBM. If you just wanted someone to write a check to the pharmacies every time they dispensed a drug, I could have saved myself a lot of money. They're supposed to manage the program.

(COF ¶ 81). After the NYCTA blocked the 34 pharmacies and 26 prescribers, the NYCTA's compound spend plummeted from over $43 million in the second year of the Contract to $10,752,258 in the third year of the Contract. (COF ¶ 80).

## **LEGAL STANDARD**

A summary judgment movant must show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine and material factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is the movant's burden to show no such dispute exists. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). If the movant so demonstrates, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). On summary judgment, courts must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

"[S]ummary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). An ambiguous contract subject to varying reasonable interpretations makes the parties' intent a question of fact and summary judgment inappropriate. *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990). Whether a contract is ambiguous is a question of law. *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir.2010).

## ARGUMENT

## ESI HAS FAILED TO CARRY ITS INITIAL BURDEN DEMONSTRATING AN ENTITLEMENT TO SUMMARY JUDGMENT

ESI seeks to evade responsibility for its multiple breaches of the Contract by mischaracterizing the NYCTA's actual claims and ignoring the facts alleged in the Amended Complaint and confirmed during discovery that support them. By overstating the NYCTA's causes of action, understating its own contractual obligations, omitting the critical facts, and ultimately sidestepping the NYCTA's entire affirmative case, ESI has failed to carry its burden as the summary judgment movant. The motion should therefore be denied.

## I.      ESI Mischaracterizes The NYCTA's Claims

Among ESI's many mischaracterizations is its packaging of the NYCTA's claims under the self-defined term "Fraud Prevention Duties."[3] ESI maintains this false framing through its entire brief, proclaiming the "NYCTA must present admissible evidence of *fraudulent conduct* on behalf of a pharmacy, prescriber, or member that ESI either failed to identify or failed to address upon identifying." ESI Memorandum ("MOL") at 17 (emphasis added). Elaborating further on this point, ESI asserts "[s]uspicious practices are not, however, *evidence of actual fraud*" and "the mere fact that NYCTA's compound drug spend increased is not evidence, on its own, of fraud." ESI MOL at 18 (emphasis added).

None of this is an accurate characterization of the NYCTA's claims or the actual provisions of the Contract.[4] As the NYCTA has maintained throughout this litigation, the

---

[3] Just in the first page of its brief, Express Scripts falsely claims: (i) the NYCTA's theory of the case is simply "compound spend increased, Express Scripts was NYCTA's PBM, so Express Scripts must be at fault"; and (ii) the NYCTA "struggles" to describe its claims and "when asked to explain, exactly, what Express Scripts did or did not do . . . simply points back to the high compound spend . . . ." *See* ESI MOL at 1.

[4] Unfortunately, this is emblematic of Express Scripts' conduct throughout this litigation. *See* ECF No. 76 ("The Court is troubled by the conduct of Express Scripts, including but not limited to its strained interpretation of the Court's prior order, its apparent foot dragging and hide-the-ball approach to disclosure of the Tricare documents, and

NYCTA's breach of contract claims assert ESI failed to fulfill its reasonable due diligence and standard of care obligations "to take adequate measures to monitor, identify, and stop activity that, on its face, bore the hallmarks of fraud, abuse, and excess." Am. Compl. at ¶ 5, ECF No. 42. The NYCTA's allegations focus on ESI's failure to address the "obvious outlier indicators" of Fusion Pharmacy and Dr. Cohen by timely "informing" the NYCTA and "blocking" these outliers earlier in the Contract term. *Id.* at ¶ 60 ("ESI failed to take proactive measures to block the physician from prescribing further prescriptions, block the pharmacy from further filling them, and/or inform the NYCTA of these clear indications of abusive, excessive, or fraudulent claims."). These outliers were too egregious and obvious to be ignored, regardless of whether they constituted actual fraud.

## II.     The Contract Required ESI To Apply Reasonable Care And Industry Expertise Rather Than Withhold Egregious Outliers And Red Flags

Article 4 of the Contract imposed specific pharmacy benefit *management* obligations on ESI as part of a broader duty to apply reasonable care and industry expertise. ESI's crabbed reading of the contract provisions cavalierly dismisses any responsibility other than to process and pay claims—without regard to the cost impact on the NYCTA and without any basic review to identify egregious outliers and red flags. At a minimum, given its discussion and frequent distortion of the actual Contract provisions in suit, ESI has not met its specific burden to demonstrate the Contract is "wholly unambiguous."

---

its inapposite analogy to the CVS documents."); ECF No. 98 ("Although the Court's Order of November 20, 2020, *see* ECF No. 89, did not itself limit the scope of the contention interrogatories that Defendant could serve, the Order was not issued in a vacuum. Instead, it memorialized the Court's oral order during the discovery conference held on November 19, 2020, see ECF [96-1], at 23, which authorized Defendant to serve four contention interrogatories for the purpose of "identify[ing]... the claims really that are at issue in the complaint," ECF [96-1], at 5. Interrogatory Nos. 3 and 4 plainly go beyond the scope of what the Court authorized. Interrogatory No. 2 is a closer call, but the Court concludes that it too goes beyond the scope of what was authorized.")

A.      **The Contract Contained A Duty To Meet An Industry Standard Of Care And Reasonable Diligence**

ESI erroneously seeks to avoid any obligation to adhere to the contractual standard of care by asserting "[n]either Section 4.1 nor Section 4.14 contain any obligation to provide services relating to fraud." ESI MOL at 12. In the actual Contract, however, it is ESI's contention that its obligations extended only to situations involving actual fraud that has no textual basis whatsoever. Contrary to ESI's assertion that the standard of care provisions are not independently actionable, Section 4.7 specifically states "[ESI] shall be liable for all un-recovered Overpayments due to [ESI's] breach of this Agreement (including, without limitation, [ESI's] *failure to meet the standard of care*). . ." (emphasis added). The failure to meet the standard of care is therefore an independent breach of the Contract actionable under any of the Contract sections the NYCTA is suing on—namely, 4.1, 4.2, 4.7, 4.14, or 4.16—which makes the cases ESI cites inapposite. *See* ESI MOL at 12-13.

In any event, ESI concedes this standard of care applies to its specific obligations under Article 4, but nevertheless fails to address its withholding of outliers and red flags from the NYCTA. Accordingly, and at a minimum, whether ESI's multiple failures breached the standard of care imbedded in the Contract are fact issues for trial.

B.      **The Contract Contained A Duty To Process Claims And Provide Customer Service In A Prudent And Expert Manner**

ESI's duty under Section 4.2 to process claims and provide customer service "in a prudent and expert manner" expressly incorporates a standard of care for both processing claims and providing customer service. To fulfill its duty, ESI had to notify the NYCTA of egregious outliers and red flags. Absent from ESI's discussion of section 4.2 is any reference to the contract language itself – instead, ESI argues that Section 4.2 required it to perform only "the most basic of PBM functions: process prescription drug claims from pharmacies according to the

14

plan's coverage terms, calculate the cost of the drug, and pay the pharmacies." *See* ESI MOL at 13-14. ESI's narrow reading of Section 4.2 is inconsistent with (i) the broader language it contains; (ii) the "prudent and expert manner" standard it incorporates; (iii) the obligation it places on ESI to "review" and "investigate" claims; and (iv) the references to the terms and conditions of the agreement itself (and not just the plan documents).

ESI also argues that certain services addressed in the Technical Questionnaire "are plainly the subject of Section 4.2," which do not include "Fraud Prevention Duties." *Id.* But ESI makes no attempt to ground this interpretation in the Contract's language, which is broader and far more comprehensive than the basic services listed in the Technical Questionnaire. ESI points to no contract provision that either specifically incorporates the Technical Questionnaire into Section 4.2 or limits Section 4.2 to only those services and nothing else. Whether ESI's failures breached the broad obligations imposed by Section 4.2 is a question of fact for the jury.

### C.     The Contract Contained A Duty To Conduct Due Diligence In The Selection And Retention Of Its Network Pharmacies

As with the other contract provisions, ESI mischaracterizes the NYCTA's pharmacy-selection due diligence claim and simply asserts that "[s]ection 4.16 contains no reference to fraud detection." ESI MOL at 15. This bald statement is insufficient to carry its burden to demonstrate an entitlement to summary judgment. Section 4.16 required ESI to "exercise due diligence," to "monitor the quality of . . . [pharmacy] services" and "to direct action as appropriate to correct deficiencies." (SOF ¶ 11). Approving, processing, and paying pharmacy claims without regard to known but undisclosed red flags and looking away from obvious and egregious outliers certainly creates a triable issue of material fact under Section 4.16.

### D.     The Contract Contained A Duty To Repay Overpayments

ESI seeks to dismiss its obligation to recover Overpayments by portraying itself as nothing but a claims processor, arguing that "[i]f a claim is paid pursuant to NYCTA's Plan coverage terms it is, by definition, not an Overpayment, and compound claims were covered." ESI MOL at 15. That interpretation ignores the contractual definition of Overpayments as "payments that exceed the amount payable under the Plan *and this Agreement*," and ESI's liability for overpayments "due to [ESI's] *breach of this Agreement (including, without limitation, [ESI's] failure to meet the standard of care)* . . . ." (emphases added). (SOF ¶¶ 12-13). These provisions show a breach of the Contract (and not just the benefit plan) could result in Overpayments, and Overpayments included payments beyond those contemplated by the Contract (and not just the benefit plan), including by breaching the standard of care. Whether ESI satisfied this standard is a fact issue, especially because ESI has not even attempted to show an entitlement to summary judgment under that standard on this record.

### E.     ESI Includes Basic Fraud Protection With Its Core Services And The Enhanced Fraud Protection Under Section 4.35 Is Irrelevant

ESI's argument under its "Fraud Prevention Duties" theory that the NYCTA did not purchase the enhanced fraud services offered in Section 4.35 of the Contract is irrelevant. It is undisputed the NYCTA did not purchase the enhanced program. The NYCTA stated a claim (the sixth cause of action) under Section 4.35 only as to its retiree Medicare beneficiaries, which were enrolled in the enhanced program. *See* Am. Compl. ¶ 95, ECF No. 42 (sixth cause of action alleging breach under section 4.35 by failing to administer enhanced fraud program "for EGWP plan beneficiaries"). The sixth cause of action never pertained to the NYCTA's commercial plan for current employees, and ESI thus rests its motion for summary judgment on a non-existent

claim. Nevertheless, because discovery has not adduced any evidence that the compound spike extended to its EGWP beneficiaries, the NYCTA is discontinuing its sixth cause of action.

ESI's additional efforts to discredit the NYCTA's actual claims by referencing the enhanced program under Section 4.35 the NYCTA did not purchase are unavailing. The monetized fraud program referenced in section 4.35 is an *enhanced* one. (SOF ¶¶ 14-15). It is distinct from the *basic* fraud, waste, and abuse services ESI promises all its customers, including the NYCTA. This basic/enhanced dichotomy is imbedded in Section 4.35 itself, which ESI distorts: The provision references the required fee, and only if that fee is paid must ESI "administer . . . a fraud prevention and detection program, *including system edits and other procedures to **critically** examine charges for all services that appear abusive, excessive, or fraudulent.*" (emphasis added). ESI MOL at 10. ESI omits the emphasized language above, including the word "critically," which refers to the enhanced program's heightened services. Because basic fraud protection is a component of ESI's core PBM services, the Contract provisions covering those core PBM services incorporate the basic level fraud protection. As detailed below, no "advanced analytics" were required to identify the egregious outlier claims ESI approved.

### III.   ESI Failed To Identify And Then Withheld Egregious Cost Data And Red Flags From The NYCTA

Discovery confirmed ESI breached the duties in Sections 4.1, 4.2, 4.7, 4.14, and 4.16 of the Contract. The NYCTA summarizes below some of the evidence establishing triable issues of material fact, including ESI (1) failing to identify the egregious compound spend by certain pharmacies and prescribers, including Fusion, Dr. Cohen, and Dr. Honig; (2) withholding the Fusion/Honig Red Flags from the NYCTA early in the Contract term; and (3) withholding from the NYCTA its knowledge that a fraud tip it received implicated the Fusion/Honig Red Flags.

Because of these failures, the NYCTA paid tens of millions of dollars for compounds, all of which the NYCTA would have otherwise avoided by blocking these pharmacies and prescribers.

### A.    ESI Failed To Identify Egregious Pharmacy And Prescriber Outliers, Including Fusion Pharmacy, Dr. Cohen, and Dr. Honig

Fusion (located in Utah), Dr. Cohen (located in California), and Dr. Honig (located in Connecticut), which together accounted for over $41 million in unique compound prescriptions for NYCTA's New York-based employees, were the top-of-the-chart outliers among a longer list of pharmacies and prescribers responsible for $62,121,247 in compound spend. ESI employees admitted in deposition that they could easily and quickly review pharmacy and prescriber data, and that such information has obvious utility. (COF ¶¶ 19-24). ESI's Accounts Team nevertheless failed to review the data and/or identify these outliers for the NYCTA until a blindsided NYCTA itself discovered them and repeatedly demanded ESI act. ESI failed to exercise this basic diligence despite knowing from the outset that the NYCTA, like TRICARE and New Jersey Transit before it, was particularly vulnerable to compound prescription fraud, waste, and abuse because it could not enroll in ESI's CMS. (COF ¶¶ 4-5; 97).

ESI also knew from the earliest days of the Contract term that the NYCTA was keenly interested in monitoring compound spend based on the NYCTA's early inquiries and directions on three erectile disfunction claims totaling over $400,000 just two months into the Contract. (COF ¶¶ 15-17). Jim Masella's directions to ESI regarding these claims could not have been clearer: he demanded "corrective action" and castigated ESI's Accounts Team that he was "surprised" and "disappointed" when ESI dragged its feet. (COF ¶ 16-17). Despite these early warnings and instructions to ESI, the NYCTA itself identified the enormous compound claims filled by Fusion almost a year later. (COF ¶ 56). Again, Mr. Masella demanded that ESI act, noting that "clearly something [was] wrong" and invoking ESI's "controls that should have

identified this." (COF ¶ 56). The situation repeated itself in January 2018, when the NYCTA's

Mary Beese—a civil servant without any of the resources or expertise of the largest PBM in the

country—identified obvious red flags with Dr. Cohen in a single file, demanded ESI pull all his

claims, and discovered he had authorized $22 million in compound claims, including over $8

million through Fusion between January and April 2017 (COF ¶ 68). Indeed, of the $25,157,347

in compounds filled by Fusion, $21,896,118 are attributed to prescriptions written by Drs. Honig

or Cohen. (COF ¶ 12).

At no time did ESI personnel ever say to the NYCTA "we are not required to do that

under the Contract," as ESI is now contending on this summary judgment motion. In fact, it is

undisputed that following the NYCTA's repeated demands for diligence and action, ESI

subsequently and belatedly undertook the kind of diligence and preventive action the NYCTA

demanded. ESI's conduct followed a specific pattern: After the NYCTA sounded the Fusion

alarm, ESI finally reviewed the NYCTA's claims data by pharmacy and recommended dozens of

pharmacies for the NYCTA to block; after the NYCTA sounded the Dr. Cohen alarm, ESI

provided similar data on prescribers and made similar recommendations. (COF ¶¶ 56-83). When

the NYCTA repeatedly demanded that ESI do this and complained that it had not done so earlier,

ESI complied—albeit far too little and far too late—establishing by its conduct that this is

precisely the type of basic PBM diligence in customer account management and pharmacy

network maintenance ESI should have provided from the outset of the Contract.[5]

---

[5] On this score, ESI misrepresents a critical piece of evidence. In its "Factual Background" section, ESI states that, "during the first year of the Contract . . . [it] broke down [the NYCTA's] compound spend into the top prescribers and pharmacies." ESI MOL at 5. The exhibit it cites in support of that proposition is a presentation and cover email, dated May 16, 2017, from ESI's Mark Wermes to Jim Masella of the NYCTA, attaching "a Powerpoint deck that we have developed to discuss the problems with Compounded prescriptions. Sorry this has taken so long to get back to you…" ESI MOL at 5, n. 25. ESI therefore provided this information *after* the NYCTA had flagged Fusion Pharmacy weeks earlier. At a minimum, the exhibit ESI cites creates a triable issue regarding ESI's failure to provide this information affirmatively and earlier in the Contract term.

**B.     ESI Withheld From The NYCTA Red Flags It Discovered In Fraud, Waste And Abuse Investigations That Specifically Implicated The NYCTA**

ESI knew about the Fusion/Honig Red Flags when it opened the investigation in July 2016. (COF ¶ 38). All ESI did was send letters to Fusion's owner asking some basic questions and accept his denials of any wrongdoing. (COF ¶ 41). Despite having information pointing to egregious problems at Fusion—information it never disclosed to the NYCTA—ESI kept Fusion in its pharmacy network and continued to approve, process, and pay millions of NYCTA dollars to Fusion. (COF ¶¶ 10-12). ESI kept the NYCTA in the dark about all of this.

As the record evidence of this episode establishes, and as the NYCTA will prove at trial, ESI's failure to fulfill its basic level fraud, waste, and abuse obligations are systemic. ESI circumscribes its entire basic fraud, waste, and abuse apparatus by asserting it cannot take any action against a network pharmacy unless ESI "substantiates" actual fraud. (COF ¶¶ 33-35). When the suspicious activity indicates potential collusion among pharmacies, prescribers, and members, ESI's self-imposed standard effectively requires an admission by conspirators. (COF ¶¶ 33-35). As a result, pharmacies engaging in egregious waste and abuse, like Fusion, with substantial red flags of potential fraud, remain in network. Worse, ESI does not tell clients about red flags it identifies short of a formal fraud finding, even if that pharmacy is filling millions of dollars in claims for a particular client.

ESI is a pharmacy benefits *manager*, not a law enforcement agency; it is under no obligation to inform its clients only if it can "substantiate" actual fraud under some sort of criminal standard. Pharmacy benefits managers like ESI serve benefit plans, not pharmacies. No client would want its PBM to withhold from it red flags on a single pharmacy costing it tens of millions in payments unless the PBM's investigators first establish "actual fraud," and nothing in the Contract between ESI and the NYCTA imposes such a standard. ESI recognizes the client

retains full authority to decide which pharmacies fill prescriptions for its members, which is precisely why it eventually helped the NYCTA block 34 pharmacies from filling claims, even without the benefit of any red flags ESI may have identified. Yet ESA undermines its clients' decision-making authority by withholding critical information from them, as it did here.[6]

### C.  ESI Failed To Tell The NYCTA That A Fraud Tip It Received Implicated Fusion, Dr. Honig And The Red Flags It Had Already Identified

The third category of information ESI failed to provide ties its contractual breaches all together. In January 2017, after investigating a tip that several NYCTA employees were involved in a compound fraud scheme, ESI reviewed their claims history and discovered that Fusion and Dr. Honig—both of which it had just investigated—were filling and authorizing many of the claims submitted by the suspect NYCTA employees. (COF ¶ 51). ESI's Fraud, Waste, and Abuse group subsequently briefed the Account Management team servicing the NYCTA, noting that Fusion and Dr. Honig were implicated in the alleged scheme and that it had previously investigated both. (COF ¶ 54-55). Yet the Accounts Team neither relayed this information to the NYCTA, nor reviewed the claims data for Fusion, Dr. Honig, or any other implicated pharmacy/prescriber to see if there were any immediate cost issues to address or flag for the client. Indeed, nobody even advised Mr. Masella to be on the lookout for Fusion or Dr. Honig himself. ESI withholding this information certainly raises a triable issue of fact.

---

[6] ESI subsequently terminated from its entire network 11 of the pharmacies the NYCTA blocked after investigations substantiated fraud. (COF ¶¶ 84-85). Had ESI identified these problematic pharmacies to the NYCTA before it paid $16,013,510 in compound claims on the NYCTA's account, which it could have and should have done sooner had it exercised reasonable diligence and paid adequate attention to the NYCTA's compound spend by pharmacy and prescriber, the NYCTA would not be out that enormous sum.

**D.   The NYCTA Did Not Need An Enhanced Fraud Program To Protect Itself From These Basic Failures**

ESI did not need to mobilize an "enhanced" fraud program—one with "advanced analytics, full investigative services, detailed reporting, and expert consultation"—to be able to tell the NYCTA about basic and egregious outliers and red flags that ESI had already identified using its basic services. Even a cursory review of the compound prescription data would have identified outliers like Fusion, Dr. Cohen, and Dr. Honig. Aon's "quick review" of the claims data identified Fusion, and it was Mary Beese—on her own and without the resources of the largest PBM in the country—who discovered the Dr. Cohen claims just by looking at a subset of the data. (COF ¶ 68). ESI identified the Fusion/Honig Red Flags through its basic fraud program, but it chose not to tell the NYCTA. Critically, ESI never recommended or conditioned its work on the NYCTA's enrollment in the enhanced program—which ESI's witnesses testified would not have made a difference anyway. (COF ¶¶ 30-31). Concluding an enhanced fraud program is necessary to obtain information ESI has already discovered would mean a PBM can monetize and withhold red flags from its client and thereby prevent its client from taking corrective action.

**IV.   ESI's Failures To Convey Egregious Cost Data And Red Flags Caused The NYCTA's Damages, Regardless Of The Plan Design**

ESI's claim that the NYCTA is somehow responsible for its own damages because it covered compound drugs and did not implement ESI's Compound Management Solution is not a defense to the NYCTA's breach of contract claims. Before it was selected as the NYCTA's PBM, ESI knew the NYCTA could not implement the program because of an arbitrator's order. (COF ¶¶ 90-91). The NYCTA certainly did not enter a Contract requiring or instructing ESI to withhold egregious outlier data and specific red flags so the NYCTA could blindly pay for all compounds without any reasonable diligence or review by its PBM. Had ESI provided this information, the NYCTA would have adjusted course sooner and saved millions. Indeed, the

NYCTA's compound spend decreased substantially—from approximately $43 million to $10 million—after the NYCTA blocked the pharmacies and prescribers ESI recommended. And ESI recognized its belated efforts saved tens of millions of dollars. (COF ¶ 80).

## V.    The NYCTA Disclosed Its Damages In Discovery And Will Prove Damages At Trial Through Summary Evidence Of The Claims Data

The NYCTA's initial Rule 26 disclosures contain an early description of its damages that it did not formally supplement. But the NYCTA disclosed its fuller damages multiple times during discovery. For example, during a November 19, 2020 discovery conference, the parties had a lengthy discussion about the nature of the NYCTA's claims and damages:

> **THE COURT**: So let me just press you on that for a second. Is it your position that the measure of damages is every single prescription filled by those pharmacies or . . . there were pharmacies that filled proper prescriptions and did so improperly in other instances, and presumably you can recover only for the improper ones. Am I missing something?

> **MR. SIEGAL**: Right. You have it exactly right, your Honor. It is prescriptions for compound pharmaceutical products through these pharmacies and doctors during certain very specific periods of time that are at issue, where the results show that their claims were huge spikes over what would have been ordinary and customary.

ECF No. 96-1 at 19-20. The NYCTA subsequently provided this information in an interrogatory response:

> The prescription drug claims the NYCTA contends were fraudulent, abusive, excessive, wasteful, or otherwise improper (apart from the separate category of damages stemming from non-FDA approved drug claims) are all compound prescription drugs filled and authorized by the following pharmacies and prescribers during the contract term. [cite docket].

ECF No. 93-2 at 1. The NYCTA then listed the 34 pharmacies and 26 prescribers that the NYCTA blocked during the Contract term, which the NYCTA previously provided to ESI. These disclosures make this case completely different from the cases ESI cites, which involve substantial discovery failures and new categories of previously undisclosed damages sprung on

the opposing party for the first time on the eve of trial—and even in such cases, the courts often decline to issue the drastic remedy of preclusion.[7] Because no such disclosure failure or prejudice occurred here, preclusion is unwarranted.

Nor does the NYCTA need expert testimony to aggregate the relevant claims data. Fed. R. Evid. 1006 permits the use of summary evidence where, as here, the underlying information has been produced.[8] Expert testimony is neither required nor permitted.[9] ESI has (and the NYCTA has produced) the claims data for the millions of prescriptions that were filled for NYCTA beneficiaries during ESI's tenure. The NYCTA therefore intends to aggregate and present a summary of (i) the compound claims filled and authorized by the specified pharmacies and prescribers; and (ii) the non-compound claims for non-FDA approved drugs. The NYCTA will present this evidence through a summary witness, and the testimony will contain neither opinions nor conclusions.[10] Because ESI has not been prejudiced by the NYCTA's full damages disclosures, the motion should be denied.

---

[7] *See, e.g., Scantibodies Lab., Inc. v. Church & Dwight Co.*, No. 14cv2275, 2016 WL 11271874, at *31-32 (S.D.N.Y. Nov. 4, 2016) (recognizing plaintiff's multiple disclosure failures and bad faith and declining preclusion sanction nonetheless); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006) (plaintiff did not disclose lost profits until eve of trial); *Ritchie Risk-Linked Strategies Trading (Ire.), Ltd. V. Coventry First LLC*, 280 F.R.D. 147 (S.D.N.Y. 2012) (plaintiff never supplemented disclosures despite defendants' inquiries; plaintiff's responses to discovery never mentioned disputed damages category; and plaintiff's position suggested damages category would not be pursued); *Gould Paper Corporation v. Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (delinquent party "peculiarly" argued non-disclosed damages were the subject of expert testimony even though expert disccovery had long been closed); *Spotnana, Inc. v. Am. Talent Agency, Inc.*, No. 09-cv-3698, 2010 WL 3341837, at *1 (S.D.N.Y. Aug. 17, 2010) (delinquent party pointed to emails/ wire logs that "contained a series of fragmented discussions" on what was owed and "d[id] not even indicate which of those transactions relate to this action").

[8] Fed. R. Evid. 1006 provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court, " so long as "[t]he proponent [makes] the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."

[9] "In order to constitute summary evidence, the witness' declaration or testimony cannot contain opinions or conclusions." *United States v. Honeywall International Inc.*, Case No. 08-0961, 2020 WL 5793307, at *3 (D.D.C Sept. 29, 2020) (collecting cases and noting that "a calculation does not constitute a conclusion or opinion").

[10] The smaller non-FDA-approved claims portion of the NYCTA's case is based on a formal audit Aon conducted of ESI during the contract term. ESI was involved in the audit, the NYCTA produced the audit during discovery, and ESI subpoenaed and deposed two Aon witnesses on the audit itself. Accordingly, no expert testimony is needed to establish its damages.

## CONCLUSION

For the foregoing reasons, the NYCTA respectfully requests the Court deny ESI's motion for summary judgment due to its failure to demonstrate either a lack of any genuine and material issues of fact for trial or an entitlement to judgment as a matter of law on a "wholly unambiguous contract."

Dated:  May 10, 2021                    By: */s/ John Siegal*

                             **BAKER & HOSTETLER LLP**
                             45 Rockefeller Plaza
                             New York, New York  10111
                             Tel: 212.589.4200
                             Fax: 212.589.4201
                             John Siegal
                             Email: jsiegal@bakerlaw.com
                             Maximillian S. Shifrin
                             Email: mshifrin@bakerlaw.com
                             Alexa Bordner
                             Email: abordner@bakerlaw.com

                             *Attorneys for Plaintiff*
                             *New York City Transit Authority*